361 F.Supp. 647 (1973)
WAGNER ELECTRIC COMPANY, Plaintiff,
v.
LOCAL 1104 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, Defendant.
No. 71 C 500(2).
United States District Court, E. D. Missouri, E. D.
March 16, 1973.
*648 Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.
Levin & Weinhaus, St. Louis, Mo., for defendant.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
By this Section 301 action[1] injunctive relief and money damages are sought. The suit stems from a work stoppage alleged to be violative of the no-strike clause in the collective bargaining agreement between the parties. We have jurisdiction under Section 185, 29 U.S.C.
The provision of the collective bargaining agreement relied on by plaintiff provides in pertinent part:
"The Union agrees that during the term of this Agreement there shall be no strikes, * * * stoppage of work, or any other form of interference of production or other operations * * *."
In other provisions of the agreement an orderly grievance and arbitration procedure for processing and settling disagreements is set forth.
At the times in question the Union was and still is the sole bargaining agent for approximately 2700 of plaintiff's employees. The bargaining units represented by defendant consist of all of plaintiff's production and maintenance employees and certain clerical employees[2] employed at plaintiff's three plants (Lackland, Plymouth and Berkeley) in St. Louis County, Missouri. Each plant operated on three shifts, the first from 7:30 A.M. to 4 P.M., the second from 4:00 P.M. to 12:30 A.M., and the third from 12:30 A.M. to 7:30 A.M. The 2700 employees represented by the union were scheduled to work these shifts during the week commencing on August 9, 1971 and ending on Friday, August 13, 1971.
There is a chief steward (formerly called building chairman) on each shift for all departments in each of the three plants, and a steward on each shift for each department within the plant. These functionaries are elected by the union members in each plant and department respectively. Each chief steward has authority to determine what action should be taken with respect to oral grievances which have not been resolved at the department level by the steward.
By way of background: In July of 1971, a disagreement arose between the parties concerning the interpretation of seniority provisions of the collective bargaining agreement as they apply to reassignment rights of employees. This dispute resulted principally from plaintiff's decision to eliminate the third shift at its Lackland plant. On August 6, union representatives from the Lackland plant together with union Vice-President Theodore Crockett met with Lackland plant management to discuss the disagreement. However, no formal grievance was filed relating to the dispute until after the work stoppage was in progress.
On August 6, 1971, the employees were notified of the monthly union meeting to be held on August 9, 1971. The notice informed the members that "a very special order of business" would be brought up concerning employees' seniority rights, and urged all members to attend if they valued their jobs and seniority rights. A separate meeting was held for each of the three shifts. The first meeting was at 8 a. m. for the third shift. About a dozen members were present. The second shift met at 2 p. m., and the final meeting was at 8 p. m. for the first shift members. Also in attendance at the last meeting, at the invitation of union President Raymond Wotjtowicz, were Richard Bowman, the chief steward of the second shift at Lackland, Jerry Blankenship, an executive *649 board member, and Robert Regelski, a steward from the second shift at Lackland. Bowman and Blankenship had earlier attended the 2 p. m. second shift meeting. They later requested and received permission from plaintiff to leave their work to attend the evening first shift meeting.
Following the first shift meeting, Bowman, Blankenship and Regelski reported back to the Lackland plant at about 11:30 p. m., and upon their arrival talked to various groups of employees and were seen beckoning to employees to leave the plant. They were also heard to state to employees that a strike decision had been made and that the only question was whether to walk out at once or to wait until the end of the shift to walk out. Immediately thereafter the second shift employees began leaving the plant, and by 11:45 p. m. almost all of them (Bowman, Blankenship and Regelski included) had walked out, although they were not scheduled to leave the plant until 12:30 a. m.
Some of these second shift Lackland workers proceeded to plaintiff's Plymouth plant. However, the Plymouth employees remained on the job for the remainder of the second shift. There is evidence, which we credit, that executive board member Turner appeared at the Plymouth plant entrance early in the morning of August 10 and was heard to tell employees who were congregating there that a strike was in progress and they should not cross the picket line. In addition, Turner not only took no action to get the numerous employees milling around the entrance to go to work but he himself did not go to work that day.
On August 10, 1971, virtually all of the 2700 union members, among them all of the executive board members, all of the chief stewards, and all of the stewards, failed to report for work. Commencing on that morning, large groups of the employees including stewards and chief stewards congregated outside the Lackland and Plymouth plants at times they should have been working. Material and equipment were available and ready for operation and production had the employees reported.
At about 5:30 p. m. on August 10, this Court issued a temporary restraining order to prevent the union members from concertedly refusing to perform services for plaintiff. However, it was not until the following day that the employees reported for work, and even so only about one-fourth of the first shift employees and about one-half of the second shift employees at the Lackland plant reported on August 11th.
Did the union breach the no-strike clause? We hold that it did. That the contract expressly provides "there shall be no strikes" is admitted. That there was a strikevirtually 100 per cent effectiveis not in dispute. It is the position of the defendant that at worse what occurred was simply a wild-cat strike which was neither called nor sponsored by the union as such. In our judgment, whatever name be given to the strike, and even though there is no evidence that a formal strike vote was taken, the circumstances here present are not such as to relieve defendant of liability for the strike prohibited by the contract.
Involved in this case is an express, broad and all-inclusive "no strike clause." In this respect, the case differs from those in which a no-strike agreement is implied by the courts from an agreement to settle all disputes and disagreements by compulsory arbitration. The case also differs from those in which the agreement expressly or implicitly requires proof of an affirmative strike vote by the union or which insulates the union from damage liability for "unauthorized" strikes. Here, the agreement, in unambiguous language, assured the employer that without exception "there shall be no strikes [or] stoppage of work."
We start with the premise that the union does not consist merely of the elected officers, but rather is made up of its rank and file members. "As long as a union is functioning as a union it *650 must be held responsible for the mass action of its members." Vulcan Materials Company v. United Steelworkers of America, 5 Cir., 430 F.2d 446, 455; United States v. International Union, United Mineworkers of America, D.C.D. C., 77 F.Supp. 563, 566; United States v. Brotherhood of Railroad Trainmen, D.C.Ill., 96 F.Supp. 428, 431.
It is true there is no direct evidence that a strike was formally authorized either at the meetings of August 9 or otherwise. Nevertheless, the circumstances here present renders suspect the union's claim that what happened was simply spontaneous individual action on the part of Lackland employees dissatisfied with the company's plan to eliminate the third shift at that plant. We note that only about a dozen of all third shift employees attended the first of the August 9 meetings in spite of the strong language in the notice of the meeting. Apparently attendance was improved at the second of the meetings at which the second shift members expressed their views. During all of the meetings the sentiments of the union's leadership was expressed in rather strong language and the employer was denounced for "abusing" the rights of employees and allegedly violating the contract. Statements were made by officers to the effect they would not "stand for" such company action. Although treasurer Crockett stated that he had attempted to set up a meeting for the following Thursday with management, intimating that the members should defer any action until after such meeting, it is clearly to be inferred that the members were given the option of walking out to exert pressure on management at the Thursday meeting. In this connection it is significant that Bowman, Regelski and Blankenship were invited by the union president to leave their jobs on the second shift for the purpose of attending the 8 o'clock meeting, even though at least Bowman and Blankenship had already attended the earlier meeting of their own shift.
We believe that even though a formal strike call may not have been issued, what occurred was union strike action, in that the walkout was initiated by Bowman, Regelski and Blankenship upon their return to the Lackland plant immediately following the last of the August 9 meetings. When they told the employees that a decision to strike had been made and that the only question was whether to leave the job immediately or at the end of the shift we may reasonably infer that they were speaking for the membership present at the meetings and that the decision they referred to had in fact been made. The prompt response of the second shift employees to the statements clearly indicate that they had no doubt as to the reality of the strike call.
Defendant questions the authority of a chief steward to call a strike. We do not believe that the strike was in fact called simply by an individual steward or chief steward. The case of NLRB v. P. R. Mallory & Co., 7 Cir., 237 F.2d 437 which involved an alleged unfair labor practice, as distinguished from a breach of contract, is relied on by defendant. The issue there was simply whether the union had caused the employer to discharge an employee because of her nonmembership in the union and the court concluded that the acts of a few out of a total of several hundred stewards (completely contrary to the express policy of the union) did not, under the circumstances, bind the local union. Mallory is wholly inapposite. We note that it has been several times distinguished and narrowly limited to its specific facts. See for example, NLRB v. International Longshoremen's and Warehousemen's Union, 9 Cir., 283 F.2d 558, 564-565, and NLRB v. Local 815 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 2 Cir., 290 F.2d 99, 104-105. Here, there is more than mere individual action on the part of one or two stewards but rather, all of the union's functionaries, the stewards, chief stewards and executive board members participated in and supported the work stoppage by the entire membership. In these circumstances *651 and in light of the fact that the work stoppage resulted from a union as distinguished from a mere individual grievance, the inference is clear that the union as such is responsible therefor.
We are not impressed with the action of the union hierarchy in attempting to disclaim responsibility for the walkout. When the union President came to his office at 7:30 on the morning of August 10, he then became aware, if he was not previously, that his union members were engaged in a work stoppage. He saw a number of members who should have been working milling about his outer office, yet he made no effort to order them out of the office and back to work but instead proceeded to work on some other matters which he deemed of more consequence. Several hours later, when the full impact of what was occurring was beginning to be evident, he called the union attorney for advice and it was at the instance and with the assistance of the union attorney, who promptly came to his office, that an exculpatory press release was drafted. He telephoned the executive board members at their homes, and instead of expressing dismay, indignation or surprise that these officials were not at work, called them to his office for a meeting at which a back-to-work order was considered and approved around noon. In our judgment these decisions resulted from advice of counsel in an attempt to avoid union responsibility for union conduct. The belated disavowal of the strike does not suffice to relieve the union of its liability for its breach of the no-strike agreement. Parenthetically, we add that there is not the slightest indication in the record that any disciplinary action was ever taken by the union against any of the strikers or the leaders of the strike.
One further comment. Although the union disavows responsibility for the company-wide strike which unquestionably is violative of the agreement that "there shall be no strikes," and insists that only its members and not the union struck the company, there is no suggestion that the striking members should be held liable for the damages sustained by the company. In the recent case of Sinclair Oil Corporation v. Oil, Chemical and Atomic Workers International Union, 7 Cir., 452 F.2d 49, it was held that union members who engaged in wildcat strikes for which the union itself is not liable may not be subject to individual liability for damages.[3] If Sinclair correctly expresses the law then it would follow that the employer who is struck by the concerted action of all union members is left without remedy other than by the discharge or discipline of the individual strikers, a remedy which is obviously inadequate.
Should a permanent injunction issue? We have concluded that the injunction heretofore issued has served its purpose. Both the union officials and the rank and file members appear to have learned their lesson with the aid of counsel, so that we deem it extremely unlikely that any other strike will occur during the effective period of the collective bargaining agreement.
The remaining issue is that of damages. That damage was sustained by plaintiff is conceded. In this situation, plaintiff is not required to prove the amount of its damages with mathematical accuracy, an impossible task. It is sufficient if the evidence supports a just and reasonable approximation of damages. United Electrical Workers v. Oliver Corp., 8 Cir., 205 F.2d 376; Sheet Metal Workers, International Association, Local 223 v. Atlas Sheet Metal Company, 5 Cir., 384 F.2d 101, 109.
Here, the damage claim is based on continuing overhead costs that were not offset by production on August 10, 1971 and in part on August 11, 1971. For the purpose of determining these *652 overhead costs, an audit was made of plaintiff's books and records. The approach taken in the audit was that the company's overhead is based on a per cent of direct labor costs expended and units being produced. It was recognized that on the days in question plaintiff had certain materials, buildings and equipment ready for its employees to utilize in turning out inventoriable items raw material, work in process and finished product, going from one stage to another based on the work performed by direct labor. Under the audit, there were certain fixed costs in the company's operation which continued on August 10 and August 11 and which would normally be offset against units being produced on those days, but since the employees comprising the direct labor force who were scheduled to work on those days performed no direct labor at all on August 10 and only some labor on August 11, these fixed costs were not absorbed at all on August 10 and only partially on August 11.
The approach taken in the audit is recognized as sound accounting practice in determining the results of operations. In addition, the inclusion of certain indirect labor items could have been justified in calculating overhead not absorbed, but the entire category of indirect labor was removed from consideration in making the calculations. Based on the approach taken in the audit, the overhead not absorbed in the manufacturing department of plaintiff amounted to $103,542 for August 10 and $19,563 for August 11, an aggregate for those two days of $123,105. In addition the audit reveals that with reference to its Selling, General and Administrative Departments, to the extent those operations were affected by the work stoppage, the overhead not absorbed on August 10 was $41,983 and for August 11, $9,001, a total of $50,984. The grand total as shown by this audit of overhead not absorbed and for which plaintiff makes claim amounts to $174,489.
For purposes of determining the unabsorbed overhead on the particular days of the work stoppage, the audit utilized the pre-determined schedule of work days for the entire year, broken down into twelve accounting periods. In the accounting period in which the work stoppage took place there were twenty scheduled working days. Although the scheduled number of work days were pre-determined, the overhead allocated to each of these work days represented actual expense monies paid out for such overhead items as light, power, dues and subscriptions, medical expenses, hospital supplies, doctor services, postage, freight, and commissions, as well as depreciation and other recognized overhead categories. Ordinarily, the amount of overhead broken down on a daily basis would be charged to or absorbed by inventoriable items produced. However, since there was no production on August 10, 1971, this day's part of the overhead could not be charged to inventoriable items and were treated simply as expenses the company could not recoup. A similar treatment was made of the portion of August 11, 1971 as to which there was a work stoppage.
Evidence on behalf of defendant was to the effect that there are other approaches consistent with sound accounting practice under which a few items treated as overhead in the audit could be handled differently. The method used by plaintiff was that which it followed consistently in its cost accounting.
Obviously, the determination of the cost of running a plant for one day or a portion of a day presents a problem. In arriving at our conclusion on this issue we have eliminated from the charges shown on the plaintiff's audit certain items which are questioned by defendant such as overtime bonus for work which was obviously not done, as well as shift differentials, no shift having worked, freight in and freight out, which could well have been charged against the cost of goods sold (although that was not plaintiff's normal method) and certain other expenses of selling, travel and entertainment and some general administrative costs. After removing such *653 items from consideration, it is our view that a fair and just approximation of the damages sustained by plaintiff and for which defendant should be charged is at least $70,000.00.
The foregoing memorandum constitutes our findings of fact and conclusions of law.
NOTES
[1] Section 185, 29 U.S.C.
[2] There are approximately 500 other employees of plaintiff who are not in the bargaining units.
[3] A contrary view had earlier been expressed by District Court Judge Juergens in DuQuoin Packing Co. v. Local P-156, Amalgamated Meat Cutters and Butchers Workmen of North America, D.C.Ill., 321 F.Supp. 1230.