PENN PACKING COMPANY, INC.,
Appellant,

v.

AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA LOCAL 195 et al., Appellees.

No. 73-1963.

United States Court of Appeals,
Third Circuit.

Argued Feb. 26, 1974.

Decided May 31, 1974.

Tom P. Monteverde, Max L. Lieberman, Pelino, Wasserstrom, Chucas & Monteverde, Philadelphia, Pa., for appellant.

Charles G. Nistico, Edward Davis, Howard J. Casper, Mark P. Muller, Davis, Casper & Muller, Philadelphia, Pa., for appellees.

Before HUNTER and WEIS, Circuit Judges, and MILLER, District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The recurring question of a union's responsibility for losses incurred by an employer as a result of a wildcat strike is before us in this appeal. We conclude that the district court's resolution of factual issues in favor of the union was not erroneous and that a proper interpretation of the collective bargaining agreement supports the judgment in favor of the defendant.

Two hundred members of Local 195 participated in an unplanned and unexpected work stoppage at the plaintiff-employer's plant in Philadelphia, Pennsylvania in the forenoon of October 6, 1971. At 10:00 P.M. on that same day, the district court issued a restraining order to end the walkout. However, the workers did not return until two days later, resulting in substantial loss to the plaintiff. The employer thereafter sought damages from the union alleging that it violated a no-strike clause in the contract.

The trouble at the plant began when the 4:00 A.M. cutting room shift, which ordinarily had its "lunch" break at 8:30 A.M., was ordered by the plaintiff's foreman to begin 15 minutes earlier. The foreman took this action because a

conveyor belt had malfunctioned and had brought operations in the cutting room to a halt.

Some of the employees objected and their newly elected steward, Joseph Simon, so advised the foreman. After some discussion, the foreman called the company president, Martin Lipoff, to the scene, and Simon requested the plant's steward, Charles Cole, to join in the negotiations. Lipoff advised the stewards that they would be discharged if they did not abide by the foreman's order. When they failed to change their position, Lipoff carried out his threat. It was then about 8:30 A.M., the regularly scheduled time for the lunch break, and all employees walked out. They did not return at 9:00 A.M. when the usual half hour lunch period ended.

In the interim, both Cole and Lipoff spoke by telephone to Albert Frankenfield, the union business agent, advising him of the problem.

Cole and Simon then spoke to the employees standing outside the plant and recommended a return to work. At this time Frankenfield and the union secretary-treasurer, James T. O'Malley, arrived at the plant and also urged the men to end the walkout. The employees, however, refused to do so, boisterously asserting that they would not return until Cole and Simon were reinstated.

Frankenfield and O'Malley went into the plant to negotiate with company officials, but Lipoff refused to rescind his discharge order. The union officers returned to the area outside the plant where the employees were assembled and again urged an end to the walkout. They were unsuccessful, the crowd emphatically refusing to follow instructions. Later that morning, on a third occasion, the union's efforts to get the men back to work had a similar, unsatisfactory result.

A meeting of the employees was scheduled to be held in the union hall at 10:00 A.M. on the following morning,

October 8, 1971. Sentiment of the many who attended was to continue to remain away from work and was not changed until the officers, in a most unusual action, proposed that the union pay the salaries of Cole and Simon until an arbitrator had ruled on the propriety of their discharges.[1] This unprecedented suggestion was acceptable to the assembled workmen, and work resumed on the following day at 4:00 A.M.

The contract between the company and Local 195 included a no-strike clause which had been incorporated in various successive agreements between the parties for about twenty-five years. Apparently, its wording during that time had not been changed. It reads as follows:

> "The Union for itself and for its individual members agrees and guarantees that there shall be no strike, stoppage of work, slowdown, or other interference with production. The Employer agrees that he shall not lockout his employees during the term of this agreement . . ." (Article XI, § 1).

■ The plaintiff contends that the wording in this clause makes the union liable for any loss to the employer caused by work stoppage whether authorized by the union or not—what might be called a "no fault" duty of indemnity on the part of the union.

The district court reasoned that to impose such an unusual obligation, very explicit language in the contract would be required. We agree with this interpretation.

The costs of wildcat strikes are apt to be high, a fact of which employers are keenly aware, but which is certainly not unknown to union officials. Understandably, employers are anxious to secure all the protection possible to prevent such losses and, if possible, to secure indemnity. It is most unlikely that a union would shoulder such a large risk

1. The arbitrator ultimately reinstated the men but without pay for the seven week in-

terval from the date of the walkout to the time of the award.

without clearly stating its intention to do so.

■ If the word "guarantees" were eliminated from the no-strike clause, it is clear that there would be no obligation on the part of the union to pay for any loss as a result of an unauthorized strike. The clause then would read: "The Union for itself and for its individual members agrees that there shall be no strike, stoppage of work, etc." Seemingly, it is the addition of the word "guarantees" that leads the plaintiff-employer to argue for an indemnity agreement. Webster's Third New International Dictionary, 1007 (1968 ed.), defines "guarantee," *inter alia,* as:

" . . . undertake to answer for the debt, default, or miscarriage of (another): become responsible for the fulfillment of (the agreement of another) . . ."

The employer urges adoption of the first definition, that is, that the union agreed to answer for any loss sustained by the employer resulting from default by the employees. But we should interpret the words in a contract of this nature to give them their ordinary and reasonable meaning.[2] When viewed in this light, common experience leads to the conclusion that at the time the parties negotiated this clause, the intention was to utilize the second cited definition. It was in the minds of the parties, therefore that the union agreed to become responsible for fulfillment of the obligation of the employees to continue to work, pending arbitration of disputes. Thus, the union did not agree to pay for any loss to the employer from an unauthorized strike but did commit itself to use its best efforts to end the stoppage as soon as practicable. In effect, this is the interpretation that the trial judge found to be applicable and with which we agree.

■ To apply such a meaning to the language in the agreement is consistent with the decisions in Yale & Towne Manufacturing Co. v. Local Lodge No. 1717, 299 F.2d 882 (3d Cir. 1962); Pennsylvania Greyhound Lines, Inc. v. Amalgamated Association, 14 F.R.D. 11 (W.D.Pa.1953); and Eazor Express, Inc. v. International Brotherhood of Teamsters, etc., 357 F.Supp. 158 (W.D. Pa.1973). Each of the foregoing cases involved different contractual terms, but the tenor of the opinions is that liability would not be imposed upon a union for an unauthorized strike in the absence of specific language so requiring. We think that such a construction is fair and reasonable.

■ The district court found that as soon as responsible officials of the union learned of the walkout, they, in good faith, exercised every available means, including a novel and unprecedented procedure to end the work stoppage. This finding of fact, which is not clearly erroneous, distinguishes such cases as Wagner Electric Co. v. Local 1104, 361 F.Supp. 647 (E.D.Mo.1973); Eazor Express, Inc. v. International Brotherhood of Teamsters, etc., *supra*; and Adley Express Company et al. v. Highway Truck Drivers and Helpers, Local No. 107, 349 F.Supp. 436 (E.D.Pa.1972).

One other important factual issue has been resolved against the plaintiff, and that is that the trial court has found that the union did not sanction, approve, or incite the strike. Thus, such cases as Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247; Wagner Electric Co. v. Local 1104, *supra*; Eazor Express, Inc. v. International Brotherhood of Teamsters, etc., *supra*; and Adley Express Company et al. v. Highway Truck Drivers and Helpers, Local No. 107, *supra,* are not on point. In each of those cases the court found that there was, in fact, action by the union which was the cause of the work stoppage.

■ The plaintiff also argues that the union should be held responsible un-

---

2. *See* 3 Corbin on Contracts § 535.

der a theory of agency for the acts of the two stewards. Vulcan Materials Co. v. United Steelworkers of America, *supra*. But again, the employer's contention has no strength because it runs contrary to a finding made by the trial court that the stewards tried to persuade the men to return to work and that they did not incite the strike or ratify the employees' action.[3]

The judgment of the district court will be affirmed.

---

3. As the trial court further points out, even assuming a situation favorable to the plaintiff, which we are not required to do here, that the stewards' conduct was union-approved by implication, it was specifically and immediately overruled and countermanded by senior union officials. The agency problem is one of fact, was resolved adversely to the plaintiff, and affords no basis for relief.