**UNITED STATES STEEL CORPORATION, Plaintiff-Appellant,**

v.

**UNITED MINE WORKERS OF AMERICA et al., Defendants-Appellees.**

No. 74–2904.

United States Court of Appeals, Fifth Circuit.

Sept. 24, 1975.

Rehearing and Rehearing En Banc Denied Jan. 26, 1976. See 526 F.2d 377.

M. L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellant.

George C. Longshore, William E. Mitch, Birmingham, Ala., Jack Drake, Tuscaloosa, Ala., for defendants-appellees.

Before BROWN, Chief Judge, and WISDOM and COLEMAN, Circuit Judges.

WISDOM, Circuit Judge:

This appeal is from a judgment of the district court granting an involuntary dismissal of United States Steel's claim for damages, under the Taft-Hartley Act, § 301(a), 29 U.S.C. § 185(a) (1970), against the United Mine Workers of America, UMW District 20, and UMW Local 8982. The case illustrates the increasing tendency of miners to strike in violation of the no-strike clause implied as a result of an express arbitration clause in the National Bituminous Coal Wage Agreement of 1971. *See United States Steel Corp. v. United Mine Workers of America et al.*, 5 Cir. 1975, 519 F.2d 1236. We reverse in part and remand.

The incident sparking the strike was the company's refusal to allow an injured miner to return to work. The strike began on March 13, 1974. On that day, under the authority of *Boys Markets v. Retail Clerks Local 1770*, 1970, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, the district court issued a temporary restraining order enjoining the strike. *Boys Markets* holds that a district court may issue an injunction against a strike in violation of a collective bargaining agreement between unions and employers. The temporary restraining order was allowed to lapse by its own terms,

but United States Steel now pursues its damage action against the defendant labor organizations.

During the trial, the company proffered evidence of past strikes to show a pattern of work stoppages in violation of the no-strike clause. The district court excluded this evidence as irrelevant.

At the close of the company's case, the unions moved to dismiss the suit under Rule 52 of the F.R.Civ.P.[1] The district court granted the motions and orally dictated findings of fact and conclusions of law into the record, without formality or citation of authority. The court found that the strike lasted for four shifts, a total of thirty hours, and was "relatively limited". There was an unspecified reduction in the size of the work force on the day shift of March 12; all but four miners of the 204 scheduled to work were out on the next shift; sixty worked the following shift of 203 scheduled and sixty-three of 256 worked the next day shift. Thereafter work was back to normal.

The district court concluded:

> That undertaking, however, not being explicitly spelled out in the contract and, in essence, being imposed without regard to the intent of the parties to it but as a necessary consideration for the grievance agreement, is one that must be evaluated in a particular way by the Court. Namely, I take it that there being no active promise by the Union in the contract against strikes or work stoppage, but the same being merely implied, it becomes the burden of the Company in an effort on an action for damages for breach of that to reasonably satisfy the Court from the evidence presented that the Union has in some active way made itself a party to the strike or work stoppage that is violative of the contract.

The court found that "the Union at none of its levels supported or condoned this work stoppage or strike"; that at "no time according to any evidence before the Court did any official of the Union on a Local, District or International basis in any way support or give encouragement to the work stoppage." The trial judge found that "at least one of the officers of the Local was on the job during the partial work stoppage." Furthermore, "the notification by the Company to the International of the existence of the strike was followed on an immediate basis on the same day with the telegram indicating that the Local officers were in the process of attempting to get the men back to work". There was never a strike vote, and a meeting of the Local was followed by the end of the strike.

In assessing the company's case, the district court said:

> There are but two elements of evidence that this Court has heard which in any way give rise to any inference that any of the three Union entities have condoned or encouraged or supported the strike. The sole two bits of evidence from which that conclusion might be inferred is, number one, that three members of the grievance committee did not work in the mines during this respective shift. . . . [T]he Company has not given evidence that other Union officials, particularly the officers, were likewise out of work or staying away from work during that period, and the evidence has been that at least one of the officers of the Local was on the job during this partial work stoppage. The second bit of information from which any inference can be drawn of Union support or encouragement would be the evidence that the Company has found it possible, utilizing its personnel records and personnel, to notify in the past with some ninety to ninety-five percent success persons employed at the mine on a three-hour notification, and that a

1. The district court reached the merits and decided the case against United States Steel. This is not a question whether the company made out a prima facie case, but rather whether the district court applied an erroneous rule of law, and whether it excluded evidence which, if admitted, would have had a bearing on the district court's decision.

period in excess of twenty-four hours occurred here between the commencement of the work stoppage and the time the Union officials, in effect, successfully got the men back to work.

. . .

United States Steel asserts that the district court applied the wrong standard of union liability for breach of contract under Taft-Hartley Act § 301: that union responsibility may be inferred as a matter of law from (1) the participation of three committeemen in the strike, under common law agency principles of § 301(e); and (2) the failure of the union to discipline any of its members for striking in violation of the contract. The company also objects to the district court's exclusion of evidence of a pattern of past strikes.

We conclude that the district court applied a correct standard of liability. We reverse, however, on the issue of the exclusion of evidence of past strikes and the question of the agency status of the striking committeemen.

United States Steel contends that the trial court employed the wrong standard of liability in holding that the company must show "that the Union in some active way made itself a party to the strike". This, so the company argues, may be the test under the Norris-LaGuardia Act, § 6, 29 U.S.C. § 106 (1970).[2] The contention is that the true test should be based on the Taft-Hartley Act,[3] and the common law of agency.

By this reasoning, the three committeemen, admittedly without authority to call a strike, were nonetheless agents of the local union. Their participation in the strike bound the local, the local is an agent of the district, the district is an agent of the international, and therefore all are liable in damages. Alternatively, United States Steel argues that the unions are vicariously liable for the "mass action" of their members in striking.

■ We hold that the district court did not apply too high a standard of liability. In the first place, a suit under § 301 is a contract action, and the district court was interpreting the contractual intent of the parties. It must be emphasized that there is no express no-strike clause in this contract. Rather, it is implied under the principles of *Teamsters Local 174 v. Lucas Flour Company,* 1962, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, and *Gateway Coal Company v. UMWA,* 1974, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583. It was reasonable for the district court to conclude that the parties intended that a heavier burden of proof would be required to show the union's involvement here than if they had included a strict, carefully worded no-strike clause. *See* Cox, *Some Aspects of the Labor Management Relations Act,* 1947, Part II, 61 Harv.L.Rev. 274, 306–07 (1948); *Penn Packing Co. v. Amalgamated Meatcutters Local 195,* 3 Cir. 1974, 497 F.2d 888, 890; *Note* 19 Vill.L.Rev. 665, 667–70 (1974). In *Eazor Express,*

**2.** Norris-LaGuardia Act, § 6, 29 U.S.C. § 106 (1970):

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

**3.** Section 301(b) of the Taft-Hartley Act, 29 U.S.C. § 185(b) (1970), in part, reads:

Any labor organization which represents employees in an industry affecting commerce . . . shall be bound by the acts of its agents.

Section 301(e) reads:

For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

Section 2(13) of the Taft-Hartley Act reiterates the same principle:

In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

*Inc. v. Teamsters Local 249,* 3 Cir. 1975, 520 F.2d 951 [No. 74–1759–1762, July 31, 1975], the court distinguished *United Construction Workers v. Haislip Bakery Company,* 4 Cir. 1955, 223 F.2d 872, *cert. denied* 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754, on the ground that "the collective bargaining agreement did not contain an express no-strike clause and while the court there held that a strike which was begun without following the grievance proceeding was necessarily a breach . . . there was nothing in the contract making the defendant union liable for such an unauthorized strike by its members or requiring that it take any action with regard to it."

■■■ The fact that the strike took place is not sufficient in itself to raise the presumption that the union, as an entity separate from its members, is responsible. No federal appellate court case has held unions to the high standard of vicarious liability here urged by United States Steel. Clearly, a union is not responsible for an unauthorized strike which the union officials are endeavoring to stop. *Vulcan Materials Co. v. United Steelworkers,* 5 Cir. 1970, 430 F.2d 446, 454, *cert. denied* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247, 1971 (discussed later in this opinion); *United Mine Workers v. Benedict Coal Corp.,* 6 Cir. 1958, 259 F.2d 346, affirmed by an equally divided court, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442; *Blue Diamond Coal Co. v. UMWA,* 6 Cir. 1970, 436 F.2d 551, *cert. denied* 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863; *Penn Packing Co. v. Amalgamated Meatcutters Local 195,* 3 Cir. 1974, 497 F.2d 888. *See* Cox, *Some Aspects of the Labor Management Relations Act,* 1947, Part II, 61 Harv.L. Rev. 274, 306–12 (1948); Gould, *The Status of Unauthorized and "Wildcat" Strikes Under the National Labor Relations Act,* 52 Cornell L.Rev. 672, 700–02, (1967). The Court of Appeals for the Third Circuit has held that even when the union, in its contract, "guarantees that there shall be no strike, stoppage of work, slowdown, or other interference

with production", the company must show that the union did "sanction, approve, or incite the strike". *Penn Packing* at 890–91. The court pointed out, however, that by giving a no-strike pledge the union had committed itself to use its best efforts to end a work stoppage as soon as practicable. *Id.* at 891.

*Haislip* is a major case in this area. The court held that the company must prove that agents of the union "acting within the scope of their authority, participated in, ratified, or encouraged the continuation of the strike", for the union to be liable in damages. *Id.* at 876. A similar jury instruction was approved in *Blue Diamond Coal Co. v. UMWA,* 6 Cir. 1970, 436 F.2d 551, 562. In this circuit the leading authority on this subject is *Vulcan.* There we construed § 301(e) to mean that "the acts of a union agent committed within the scope of his general authority is binding upon the union regardless of whether it was specifically authorized or ratified". *Vulcan* at 457. In that case we noted that "the Unions, through their agents, induced and encouraged the Vulcan employees to refuse to work". *Vulcan* at 456. We said: "It is well established that as long as a union is functioning as a union it must be held responsible for the mass action of its members". *Id.* at 455. Read in context, it is clear that the Court was not laying down a per se rule that a union is liable any time its members go on strike. In that case the union was "functioning as a union". *Vulcan* reaffirmed the principle that no *actual* authority of agents is required for union responsibility as long as they are acting within the scope of their apparent authority. *See Lewis v. Benedict Coal Corp.,* 259 F.2d at 352; *Haislip* at 878; *Vulcan* at 457; *Blue Diamond Coal Co.* at 567; Cox at 311; Gould at 701–2, *Cf. North American Coal Corp. v. UMW Local 2262,* 6 Cir. 1974, 497 F.2d 459.

None of the appellate cases cited by the company support a contrary conclusion. In each case, actual involvement, encouragement, or ratification by union agents was present, and in most instanc-

es the agent himself called the strike.[4] *Eazor Express, Inc. v. Teamsters Local 249,* W.D.Pa.1973, 357 F.Supp. 158,[5] relied on by the company, has since been affirmed by the Court of Appeals for the Third Circuit, supra. The opinion of Judge Maris, for the court, is consistent with *Vulcan* and the views we express in this opinion. The court held that "the continuing responsibility of the unions under the no-strike clause and the recognition of the consequent implied obligation on their part to use all available means to terminate an unlawful strike begun by their members, effectuates the intent of Congress in enacting Section 301(a) of the Taft-Hartley Act to promote and make effective agreements not to strike." 520 F.2d at 963. The court found an additional basis for upholding the finding of union liability in "the mass action theory". Citing *Vulcan* and other cases, Judge Maris wrote: ·

. . . When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups

---

**4.** Senator Taft, in his analysis of the relevant provisions of the Act, had this to say:

The term agent is defined in section 2(13) and section 301(e), since it is used throughout the unfair labor practice sections of title I and in sections 301 and 303 of title III. In defining the term the conference amendment reads 'the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.' This restores the law of agency as it has been developed at common law.

\* \* \* \* \* \*

[T]he definition applies equally in the responsibility imputed to both employers and labor organizations for the acts of their officers or representatives *in the scope of their employment.*

It is true that this definition was written to avoid the construction which the Supreme Court in the recent case of United States against United Brotherhood of Carpenters placed upon section 6 of the Norris-LaGuardia Act which exempts organizations from liability for illegal acts committed in labor disputes unless proof of actual instigation, participation, or ratification can be shown. . . . [U]nion business agents or stewards, *acting in their capacity of union officers,* may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair labor practice in the bill, even though no formal action has been taken by the union to authorize or approve such conduct.

Section 301(e) was omitted from the Senate version of the Taft-Hartley Act, but included in a narrower form than that proposed by the House in the final conference version of the Act. *See* H.Conf.Rept. No. 510 36, Number 1 Legislative History of the Labor Management Relations Act 1947, 540; Cong.Rec. June 5, 1947, at 6599, 2 Legislative History 1636–37. The legislative history discloses that Congress intended to overrule *United Brotherhood of Carpenters v. United States,* 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973, an antitrust case. The court held that evidence of actual authorization by the union agent was required for liability. Justice Frankfurter, in dissent, argued that a union could exculpate itself from liability by a mere resolution removing actual authority from agents to do proscribed acts. *Id.* at 421, 67 S.Ct. 775. *See* Cong.Rec., Senate June 12, 1947, 7001, 2 Legislative History 1622 (remarks of Senator Taft). *Id.* at 6609, 2 Legislative History 1552 (remarks of Senator Morse).

We realize the laws of agency as developed in commercial practice do not fit with perfect symmetry in the labor context. Professor Cox foresaw these difficulties shortly after the Taft-Hartley Act was passed:

The uncertainties involved in predicting how the principles of *respondeat superior* apply to labor organizations will make Section 301 a source of difficulty and may cause friction until the lines are marked out by court decisions. It would seem, however, that by care in drawing agreements, coupled with understanding judicial interpretation, the danger of undertaking a potentially disastrous liability can be avoided without destroying the 'no strike' clause as an instrument for achieving stability and uninterrupted production.

Cox, *Some Aspects of the Labor Management Relations Act,* 1947, Part II, 61 Harv.L.Rev. 274, 312 (1948).

**5.** The district court in *Eazor Express* is criticized in Note, 19 Vill.L.Rev. 665 (1974). *See* also Spelfogel, *Wildcat Strikes and Minority Concerted Activity—Discipline, Damage Suits and Injunctions,* 19 S.W.Leg. Found. Labor Law Developments 157, 186–88 (1973); Stewart & Townsend, *Strike Violence: The Need for Federal Injunctions,* 114 U.Pa.L.Rev. 459, 462 (1966).

of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members.

At 963.

In *Eazor Express* the district court, having found that the unions had not called the strike, held that they were entitled to a reasonable time (48 hours) after the inception of the strike in which to take the action required to get the men back to work. The Court of Appeals approved a period of 48 hours as a reasonable period of grace before liability attached. In another case, perhaps this case, a district judge could reasonably find that liability attached at once if the union officials with foreknowledge of an unauthorized strike failed to act or if there were a series of unauthorized work stoppages, each of short duration, creating a pattern of wildcat strikes.

It is only fair to remember, however, that discipline and discharge of errant employees are available to the employer. Moreover, nothing in the bargaining

agreement requires the union to discipline its members for participating in an unauthorized strike, and we cannot impose this duty as a matter of law.

United States Steel makes much of the fact that three members of the Grievance Committee did not work on the days of the strike. Their status as agents of the union, their role as union leaders in the mines, is hazy, at best, from the present record.[6]

 We think that their role was not sufficiently developed in the trial for the court to determine whether they were agents of the union. It is perhaps implicit in the district court's opinion that the committeemen did nothing to cause or to condone the strike. While it is clear that they had no actual authority to call a strike, they may have had apparent authority to do so, and they clearly did *participate* in the strike. *See Haislip* at 876. Commentators have disagreed on whether unions should be required to suspend or discipline errant shop stewards.[7] A finding as to whether

---

**6.** The only evidence of the role of committeemen in the record relates to their duties in the grievance machinery:

Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest possible time . · . .;

1. By the aggrieved party and his foreman who shall have the authority to settle the complaint. Any grievance which is not filed by the aggrieved party within fifteen calendar days after he reasonably should have known of such grievance shall be considered invalid and not subject to further prosecution under the grievance machinery.

2. If no agreement is reached, the grievance shall be taken up by the Mine Committee and mine management within five calendar days of the conclusion of Step 1. A standard grievance form shall be completed and jointly signed by the parties to the grievance. Such a form will be agreed upon by the parties.

3. If no agreement is reached, the grievance shall be taken up by the UMW District Representative and a designated representative of the Employer within ten calendar days of the conclusion of Step 2.

4. If no agreement is reached, the grievance shall be taken up by the Board within ten calendar days of the conclusion of Step 3, or in discharge cases, within five calendar days of notice of appeal. The Board shall consist of four members, two of whom shall be designated by the Union and two by the Employer. Neither the Union's representatives on the Board nor the Employer's representatives on the Board shall be the same persons who participated in Steps 1, 2 or 3 of this procedure.

**7.** Professor Cox, writing in 1948, took the strong position that "the defense [of ultra vires] should be sufficient to terminate liability [for a wildcat strike] if the union disavows the strike and suspends the steward immediately upon learning of their action". Cox, *Some Aspects of the Labor Management Relations Act, 1947*, Part II, 61 Harv.L.Rev. 274, 311 (1948). Of course committeemen do not necessarily play the same role as shop stewards. On the other hand, Professor Gould, an expert in the area of wildcat strikes, has written that Professor Cox's approach "would require both the Board and the courts to immerse themselves in international union procedures and resolutions so as to determine the authority of international, local, and steward under their own constitutions and by-laws. While it would seem proper to say that a union must vigorously disavow striking stewards, § 301 cannot be read to require that the union purge itself

these committeemen rise to the status of stewards would be helpful. We cannot say that failure to suspend or discipline striking agents in itself creates union liability, but it is clear that a union must effectively renounce its agents' actions if they participate in an unauthorized strike. Furthermore, when a pattern of unauthorized strikes has been shown, we think that the union should take strong and effective action with respect to the errant agents to purge itself of an inference that might be drawn that the union had in fact condoned the unauthorized strikes. We therefore remand the case for clarification as to the agency role, if any, of the committeemen.

■ The district court excluded evidence of past strikes as irrelevant to the question of damages. We conclude that this evidence was relevant. "A series of strikes which arguably amount to a pattern of activity at the local and district levels . . . may give rise to, or at least support an inference of union 'instigation, support, ratification, or condonation.'" *Central Appalachian Coal Co. v. UMWA*, S.D.W.Va.1974, 376 F.Supp. 914, 923.[8] The extreme difficulties of proof in the area of wildcat strikes, especially in the coal industry, and the liberalized attitude toward the admissibility of evidence under the new Federal Rules of Evidence, convince us that the district court should have received the proffered evidence. F.R.Ev.

Rule 406; McCormick on Evidence § 195 (2d ed. 1972) (Habit and Custom as Evidence of Conduct on a Particular Occasion).[9] Furthermore, a series of unauthorized strikes should put the unions on notice, and as suggested, raise the level of effort required to exculpate themselves from liability.[10] This strike could not have come as a surprise to the Mine Workers Union.

We establish no per se rule by this opinion. We agree with Judge Gesell:

It has been recognized in the decisions that the facts must be examined in the light of each situation and that there is no litmus test which can be applied. Formal Union action is not necessary. Each case stands on its particular facts to be examined in the light of the underlying labor agreement.

*12th & L Ltd. v. Local 99–99A, Operating Engineers*, D.D.C.1975, 396 F.Supp. 1174, 1176; 88 L.R.R.M. 2572, 2574. We express no opinion on the weight that the district court should assign to the evidence relating to past strikes or the agency status of the committeemen. It may be that the proffered evidence would have made no difference in the district court's decision. Nonetheless, fairness requires that the company have the opportunity to establish the inference of union approval or union action as best it can.

Remanded.

---

and discipline the offending members." Gould, *The Status of Unauthorized and "Wildcat" Strikes Under the National Labor Relations Act*, 52 Cornell L.Rev. 672, 701 (1967).

8. But see *Haislip* at 877–78:

[D]efendants were not rendered liable by the efforts which these men made to bring about an adjustment of the difficulty, even if they did not do everything that they might have done to that end. The question is not whether they did everything they might have done, but whether they adopted, encouraged or prolonged the continuance of the strike. There is no evidence of any sort that they did.

9. Rule 406. Habit; Routine Practice

Admissibility. Evidence of the habit of a person or of the routine practice of an or-

ganization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

10. The company argues that the unions did not make its best efforts to return the striking miners to work. *Vulcan* at 454; *Wagner Electric Corp. v. Local 1104, Int'l Union of Radio and Machine Workers*, 8 Cir. 1974, 496 F.2d 954, 956. United States Steel speculates that it was the temporary restraining order and not the efforts of the unions which got the miners back to work. We think that this question must be reevaluated by the district court in light of the proffered evidence of past pattern and practice of strikes in violation of the collective bargaining agreement.