**JIM WALTER RESOURCES, INC., a corporation, Plaintiff-Appellee,**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Defendants-Appellants.**

No. 77–2852.

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1980.

**166**

William E. Mitch, Cooper, Mitch & Crawford, Earl V. Brown, Jr., Birmingham, Ala., for defendants-appellants.

James P. Alexander, Stephen E. Brown, Gary E. Meringer, Birmingham, Ala., Charles F. Wilson, Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, HILL and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Appellant, Local Union No. 1928, United Mine Workers of America (the Local) seeks reversal of a judgment of civil contempt and an eight thousand dollar civil fine in favor of appellee, Jim Walter Resources, Inc. (JWR). Finding the action of the district court supported by the law and facts, we affirm.

JWR operates a number of underground coal mines near Birmingham, Alabama. All of the employees at its No. 3 Mine are represented by Local 1928 which is affiliated with District 20 of the United Mine Workers of America, AFL–CIO.[1] The employees at No. 3 Mine, as well as those at the other mines, were covered by a national labor contract, the National Bituminous Coal Wage Agreement of 1974. This agreement contained provisions requiring submission of local disputes to final and binding arbitration.

---

1. Employees of JWR's other mines are represented by other local unions, each of which is affiliated with the UMWA.

On June 14, 1977, Charles C. Carnes, an employee of JWR at No. 3 Mine, was fired. Mr. Carnes was treasurer of the Local and the son-in-law of Louis Johnson, president of the Local. This discharge was an issue subject to the binding arbitration provision. At 3:00 P.M. that day there was an unauthorized work stoppage and at 5:00 P.M. the Local held a "special" meeting. The meeting was attended by approximately 350 members. A resolution to strike No. 3 Mine until Carnes was reinstated was proposed and unanimously adopted.

That same day, immediately prior to the next scheduled shift, members of the Local picketed three other JWR mines. By the next day, June 15, the members were picketing JWR's No. 4 Mine,[2] the only other JWR mine in the area, as well as mines owned by other operators. The workers at all struck mines honored the pickets.

At 11:00 A.M. on June 15, 1977, the district court granted a *Boys Markets* injunction.[3] The temporary restraining order (TRO) enjoined defendants (the Local and the UMWA), their members, officers, servants, representatives and employees from directly or indirectly:

(a) Continuing to engage in the unlawful work stoppage at plaintiff's No. 3 Mine.

(b) Instigating, encouraging or assisting plaintiff's employees at No. 3 Mine, or any of them, from engaging in or conducting such work stoppage or strike.

(c) Picketing, or in any other manner interfering with the orderly resumption of or continuation of operations at said Mine, or inducing or encouraging any of plaintiff's employees to engage in the strike or work stoppage by defendants, their members, officers, or employees at said Mine by word of mouth, sign, vote, advice or device of any kind.

(d) Picketing, or in any other manner interfering with the orderly resumption

of or continuation of the operations at Bessie, Flat Top, Nebo and No. 4 Mine operated by plaintiff in support of the dispute concerning the discharge of Charles Carnes.

As a condition for enjoining the strike the district court ordered JWR to submit the Carnes dispute to binding arbitration.

The officers of the Local were informed of the TRO by the evening hours on the 15th. The following day the Local met with between 350 and 500 members present. The TRO was read to them and the president and other officers urged the members to return to work. This effort was repeated at the almost daily meetings held during the strike. The president testified he "begged" the members to return to work. None did, not even the officers. The strike vote was never rescinded.

By the 11:00 P.M. shift on June 16, pickets who were not members of the Local appeared at No. 3 Mine. These "stranger pickets" followed what we perceive from the record to be a practice of the coal fields. They carried no sign, spoke no warning, but merely parked on the side of the road leading to the mine. No member of the Local passed them to enter the mine. The district court found that these "stranger pickets" were from other locals, were friendly, part of a reciprocal agreement and were there at the behest of the Local. They remained until the end of the strike.

On June 17, with the strike still in progress, JWR sought contempt citations against the Local, its president, Mr. Johnson, and four of the members who had allegedly been picketing. Hearings thereon commenced on June 21 and were continued to and concluded on June 25, at which time the district court found the Local to be in contempt and imposed a civil fine of $8,000. The fine was to compensate JWR for losses caused by the work stoppage from entry of

---

2. The record shows that picketing in the Alabama coal fields does not require signs, placards and marching lines usually associated with picketing. The art of nonverbal communication has been keenly developed. It is sufficient for one to park a car on the side of the

road near the entranceway to a mine. The message is well understood and honored.

3. *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

the TRO until appearance of the "stranger pickets." During this period the district court found that no excuse for refusing to return to work existed. The court held three of the four members in contempt and imposed fines of $500 each.[4] Mr. Johnson was held not in contempt.

The Carnes dispute was arbitrated and on June 23, 1977, the disciplinary discharge was reduced to a suspension. The workers began returning to work later that day and almost all had done so, in all of JWR's affected mines, by the next day.

The record reflects that Local 1928 has a long history of wildcat strikes. There is a marked solidarity among the members and virtually the entire membership stayed out during the strike. Not a single union officer returned to work.[5] No effort was made to contact individual members by telephone to urge them to return to work although almost the entire membership could be alerted within hours.[6] No member of the union was disciplined for disobeying the TRO.

The district court found that the officers had made "certain efforts" which were "credible and in good faith." These efforts were deemed sufficient to excuse the president of the Local from the charge of contempt. We are not called upon to decide whether this finding is correct or clearly erroneous. We have examined it closely, however, in our review of the appeal by the Local.

The Local raises three issues on appeal: (1) it was not in contempt because compliance with the TRO was impossible, (2) the union as an entity cannot be held accountable but, even if it could, the actions of the officers protected it from or purged it of contempt, and (3) the court should not have imposed the civil fine after the strike had ended.

4. The individuals did not appeal.

5. Mr. Johnson testified that if he and the other union officers had returned to work many of the members would have done likewise.

6. As was apparently the situation after completion of the arbitration proceeding. The result,

*Impossibility of Compliance*

The Local insists it could not comply with the TRO and thus cannot be in contempt, arguing that the TRO prevented the taking of a vote to rescind the strike resolution. It further argues that any motion to rescind would have been rejected by the members, making them even firmer in their resolve to strike. Accordingly, the Local argues, the TRO imposed an impossible requirement. We find no merit in this argument. The TRO directed a discontinuance of the unlawful work stoppage, a matter begun by formal action of the union. Parliamentary niceties are not involved; compliance with a court order is. To comply, the members had only to return to work. They did not. *United States Steel Corp. v. UMW*, 393 F.Supp. 942, 947, (W.D. Pa.1975), rev'd., other grounds, 548 F.2d 67 (3rd Cir. 1976).

In contempt proceedings, "the basic proposition [is] that all orders and judgments of courts must be complied with promptly." *Maness v. Meyers*, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574, 583 (1975). The Local was ordered to end the strike and failed to do so. It knew of the order, a requisite for a finding of contempt. *In re Rubin*, 378 F.2d 104 (3rd Cir. 1967). Intent is not an issue. "[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order." *United States v. Ross*, 243 F.Supp. 496, 499 (S.D.N.Y.1965), citing this court's opinion in *NLRB v. Lawley*, 182 F.2d 798 (1950).[7]

Finally, if the Local seriously believed it could not return to work without first voting to rescind the strike resolution (which it contends it could not do because of the TRO), it would have been a simple matter indeed to request clarification or permission of the district court. It did neither.

the discharge being reduced to suspension, was quite rapidly disseminated.

7. See also the discussion by Mr. Justice Douglas in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed.2d 599 (1949).

### Union Accountability and Actions of Officers

The second issue presented is whether the union may be held accountable and, if so, whether the actions of the officers insulate the union from responsibility for failure to comply with the TRO. We find that this Local is accountable and that it is not relieved by the actions of its officers.

The rules for civil contempt were summarized in *Black Diamond Coal Co. v. Local 8460*, 597 F.2d 494, 495 (5th Cir. 1979):

> The Union can be held in contempt . . . if the strike was conducted or encouraged by its members functioning as a union, by its agents acting within their apparent authority, or by those whose acts the Union can be held to have ratified by its inaction.

■ There is no question that this strike was conducted by the members functioning as a union. They unanimously voted to strike. What they did as a group they are responsible for as a group. There is strict liability for concerted, authorized activity done in violation of a restraining order. *Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971).

■ The efforts by the officers did not shield or purge the Local. Assuming the absolute good faith and most strenuous and diligent efforts by the officers, the Local's obligation to comply with the TRO remains. The officers are only the agents or representatives of the union. The union, acting through its members, is the master. The master voted to strike and then stopped work. The efforts of the agents, in the context here presented, do not purge the master of its contempt. In an instance where the union has voted to strike in violation of an arbitration agreement, especially where there is a history of wildcatting, the union bears a heavy burden to avoid liability for failure of its members to return to work after entry of a TRO. This burden is obvious where there is an express "no strike" provision. However, a "no strike" agreement is implicit in an agreement with an arbitration provision. *Gateway Coal Co. v. UMWA*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

The district court found willful violation of its Order, including: (1) virtually none of the members returned to work, *United States Steel Corp. v. UMW*, 598 F.2d 363 (5th Cir. 1979); *Turnkey Construction Inc., v. Cement Masons, Local 685*, 580 F.2d 798 (5th Cir. 1978); (2) none of the officers returned to work, *United States Steel Corp.*, (1979) *supra*; (3) there was no effort to discipline striking members, *United States Steel Corp.*, (1979) *supra* ; (4) there was no effort to contact members who did not attend the meetings to advise of the TRO and urge them to return to work, *United States Steel Corp.*, (1979) *supra* ; and *United States Steel Corp. v. UMW*, 519 F.2d 1249 (5th Cir. 1975); and (5) the union induced the appearance of the "stranger pickets." All of this in light of prior labor relations compels the conclusion that the Local did not do that which it could have and should have done to comply with the TRO.

We need not reach the question of mass action briefed and argued at some length for in this case the union formally authorized the strike.[8]

### Civil Fine

■ The Local challenges the civil contempt fine entered to compensate JWR for its losses. The court may exercise its contempt power either to secure compliance or to compensate the injured party for the actions of the contemnor. *United States v.*

---

**8.** Unions have been held liable for concerted actions of the membership. The mass action theory has been approved, at least inferentially, in *Vulcan*, supra (authorization); *Turnkey*, supra (ratification by union business agent); *United States Steel* (1979) supra (ratification). See also *Black Diamond*, supra. We note only one case holding a union liable for mass action where there was an absence of either authorization or ratification, *Carbon Fuel Co. v. United Mine Workers*, 582 F.2d 1346 (4th Cir. 1978), aff'd on other grounds, —— U.S. ——, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).

**170**

*United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

█ The Local argues that it was improper to assess the fine after the strike, and therefore the contempt, ended. Accepting this argument would invite lightning-quick breaches of court orders, timed to make it impossible for the court to act during the breach. That is untenable and is rejected. See *San Antonio Tel. Co. v. Am. Tel. & Tel. Co.*, 529 F.2d 694 (5th Cir. 1976) (compensatory award after contempt ends); cert. denied sub nom. *Ashley v. San Antonio Tel. Co.*, 429 U.S. 999, 97 S.Ct. 527, 50 L.Ed.2d 610; *Lance v. Plummer*, 353 F.2d 585 (5th Cir. 1965), cert. denied, 384 U.S. 929, 86 S.Ct. 1380, 86 S.Ct. 1445, 16 L.Ed.2d 532 (1966).

The decision of the district court is AFFIRMED.