CONSOLIDATION COAL COMPANY,
Plaintiff,

v.

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, Arnold Miller, International President of the United Mine Workers of America, United Mine Workers of America District No. 22, Bill Jones, and United Mine Workers of America Local 1261, Defendants.

Civ. No. C 79–0283.

United States District Court,
D. Utah, C. D.

Sept. 22, 1980.

Keith E. Taylor, Parsons, Behle & Latimer, Salt Lake City, Utah, for plaintiff.

A. Wally Sandack, Sandack & Sandack, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION

JENKINS, District Judge.

### NATURE OF ACTION

This is an action for compensatory damages and injunctive relief brought under Sections 301 and 303 of the Labor Management Relations Act of 1947, as amended. (29 U.S.C. §§ 185 and 187.) Plaintiff, a corporation engaged in the operation of a coal mine in Emery County, Utah, as this case now stands is suing Local 1261, United Mine Workers of America, for damage sustained as a result of an "unauthorized" or "wildcat" work stoppage which began Thursday, May 10, 1979 at 11:00 P.M. and continued for three shifts at an alleged damage to plaintiff from $15,000 to $25,000 per day. Plaintiff further asks that defendant Local be enjoined from authorizing or participating in illegal work stoppages in violation of a collective bargaining agreement.

The parties agree that jurisdiction is proper under 29 U.S.C. §§ 185 and 187 and the court so finds.

### FACTS

There is no substantial dispute as to the relevant facts. The parties have filed cross motions for summary judgment. Plaintiff and defendant are parties to a collective bargaining agreement covering wages and conditions of employment which became effective March 27, 1978 and remains in force until March 27, 1981. It was in existence during the occurrences here.

Section (c), Article XXIII of the agreement contains a detailed grievance and arbitration procedure for the resolution of disputes between the parties during the life of the agreement. It is well established that an agreement which provides for the settlement of disputes exclusively and finally by compulsory and binding arbitration implies a no–strike obligation on the part of the union and its members. *Boy's Markets, Inc. v. Retail Clerk's Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

Thursday, May 10, 1979, the 11:00 P.M. shift, made up of workers who are members of the Local Union, did not go to work. It appears that some members of that shift were disgruntled over the manner in which a grievance filed by Mike Jacobsen was being considered.

In an attempt to quickly resolve the dispute and get union members back to work, Billy F. Miller, newly elected local president, and other union representatives immediately met with John Badnovinac, plaintiff's Mine Superintendent. They talked during the early morning hours of May 11th. A temporary solution to Jacobsen's grievance was negotiated.

Based upon this temporary resolution, on May 11, Mr. Miller went to the job site prior to the 7:00 A.M. shift and told day–shift employees to go to work. Mr. Miller advised employees that they each could be fined $50 by the union if they failed to work. He was informed by some employees that they were not satisfied with the settlement and so would not report to work at that time.

Miller and other union officials undertook other measures to get members back to work. Despite these efforts, the wildcat work stoppage continued through the afternoon shift of May 11th. A total of three shifts were not worked. Union members reported back to work Sunday, May 13, at 11:00 P.M., the next regularly scheduled shift.

## QUESTION PRESENTED–LIABILITY

The primary issue before this court is whether the local union as an entity can be held liable in damages for the work stoppages which occurred on May 10th–13th. I hold that it cannot. My reasons are set forth below.

This case is really concerned with the question of the identification of the party responsible for the acts complained of. In that regard it is important to recognize and to make explicit that a labor organization has an identity separate and apart from its members just as a corporation has an identity separate and apart from its share–holders or a government separate and apart from its citizens.

Generally speaking, a union speaks and acts in a representative capacity and in most matters does so through its lawfully elected officers. Such officers exercise power subject to the limitations found in the union's own internal structure and its own internal rules and regulations. Such officers may be displaced in accordance with such rules and regulations. But, absent such displacement, in most things, the union, the separate entity, speaks and acts and only speaks and acts through such duly elected officers.

This separateness of identity is explicitly recognized in the Norris–LaGuardia Act which specifically insulates the union from liability for certain "Unlawful Acts"[1] and the Labor Management Relations Act which permits the recovery of money damages only from the union "as an entity."[2]

1. 29 U.S.C.A. § 106. No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

2. 29 U.S.C.A. § 185(b). Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued *as an entity* and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization

There is useful distinction to be made between the union as a "representative" and the officers of the union. Such a distinction is as important in labor relations as it is in government. The union officers are empowered to act for the organization—the entity. The officers are given such power in accordance with the internal rules and regulations of the organization and until such is lawfully withdrawn, the officers may act for the organization, the entity. In short, the union officer can think, act, advise, counsel and exercise his own judgment within his periphery of power.

It is this delegation of power to an organization and to the officers thereof to act in a representative capacity which, in part, gives the union organization an identity separate and apart from its members. If the officers of the organization have the delegated power to act for the union—the entity, the individual member does not.

Thus, when we speak of the "union" it is important that we recognize we speak of it in a number of senses.

We speak of it as an entity—which can act through its duly constituted officers.

We can speak of it as a "group" of persons who act in unison—as one.

The acts of the entity need not necessarily be the acts of the group. In this case, they were not.

■ Case law has established two stated bases for union liability. *First,* a union may be held liable in damages for the actions of its officers and agents according to the ordinary doctrines of agency. *United States Steel Corp. v. United Mine Workers,* 598 F.2d 363 (5th Cir. 1979); *Wagner Electric Corp. v. Local 1104, Int. U. of E., R. & M. W.,* 496 F.2d 954 (8th Cir. 1974); 29 U.S.C. 185(b). *Second,* a union has been held liable for the "mass action" of its rank and file members as long as it is a functioning entity. *U. S. v. International Union, U. M. W. of A.,* 77 F.Supp. 563 (D.D.C.1948);

*Vulcan Materials Company v. United Steelworkers,* 430 F.2d 446 (5th Cir. 1970). While these two are stated as separate bases, a close examination of the cases demonstrates that the underlying legal theory is really the same in each.

■ Under the doctrines of agency, liability is dependent upon a showing that the union in some way made itself a party to the illegal strike. Such a showing may be evidenced by a union's adoption, ratification, or in some cases acquiesence in an illegal strike. *See U. S. Steel Corp. v. UMWA,* 526 F.2d 377 (5th Cir. 1976). Liability may be avoided by a credible demonstration of union disapproval of unauthorized acts of its members. *See Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 963–964 (3rd Cir. 1975).

■ The facts presented by the parties in this case do not show that the defendant sponsored, authorized, encouraged, condoned or in any way directed the unauthorized work stoppage. Instead, it appears that defendant union and its officers made reasonable efforts to get members back to work. These efforts included a membership meeting called by Miller and other union officials where Miller told members that the strike was illegal, violated the contract and advised them to return to work. The union also purchased radio time during the weekend and announced that the "President of the local urges union men to report to work at the next shift."

The only activity which might indicate ratification by the union of the illegal strike is the fact that all of the union officials failed to work their own shift. However, this fact alone cannot be construed as union ratification of the strike. Each of the officials was subject to threats and intimidation. Illustrative of this situation is the action of local vice–president Sitterund who, understanding his obligation to do so, initially attempted to remain on the job but

in a district court of the United States shall be enforceable only against the organization *as an entity* and against its assets, and shall not be

enforceable against any individual member or his assets. (emphasis added.)

terminated his efforts because of threats which made him fear for his safety. He subsequently resigned his position.

The evidence indicates that the union as an entity did not act in a manner which would amount to ratification of the unauthorized work stoppage.

Plaintiff urges that this court hold defendant liable under the agency doctrine for failing to take sufficient action to discourage the strike. In support of this position plaintiff cites *U. S. Steel Corp. v. United Mine Workers*, 598 F.2d 363 (5th Cir. 1979). The Fifth Circuit in *U. S. Steel* found the local union liable for damages caused by an unauthorized strike because the local official's return–to–work directives were "so lacking in authoritative forcefulness that they either were not heard at all . . . or were discounted as being merely stage lines parroted for the benefit of some later judicial review." The court held that, given the circumstances, the union local, through its officials, failed to forcefully direct the members back to work.

While the measures used to get the members back to work in *U. S. Steel* and this case are somewhat comparable, a factual distinction exists which the Fifth Circuit recognized and found pivotal in holding the local liable. In *U. S. Steel*, the mine had been the site of wildcat strikes on the average of one per month during 1977, and almost one every other month for the previous five years. Citing their earlier decision in *U. S. Steel Corp. v. U. M. W. A.*, 519 F.2d 1249 (5th Cir. 1975), the court stated that "a series of unauthorized strikes puts the union on notice, creates or supports an inference of union ratification of strike activity, and raises the level of effort required to exculpate the union from liability." 519 F.2d at 1256.

■ The court there felt the union local did not undertake sufficient affirmative activity to avoid liability given the history of repeated strikes. This holding is consistent with the court's holding in *Carbon Fuel Co.*

**3.** The Supreme Court reviewed the Fourth Circuit's decision as it applied to the International and District Unions in *Carbon Fuel Co. v. U. M.*

*v. U. M. W. A.*, 582 F.2d 1346 (4th Cir. 1978),[3] where evidence that all members of the defendant local unions, including their officers, participated in 31 work stoppages compelled the court to hold the union liable for the "wildcat strikes." In this case however, the defendant was faced with trying to avert an isolated walkout of which union officials had no advance notice. There was no ratification in the context of this case. I hold that given the circumstances in this case, the isolated nature of the occurrence, the union through its officers acted reasonably in taking measures to get members back to work and did not act or fail to act in a manner which would either condone, ratify or encourage the unauthorized walk-out.

The other base plaintiff asserts against defendant is the mass action theory articulated by Judge Goldsborough in *United States v. International Union, U. M. W. A.*, 77 F.Supp. 563 (D.D.C.1948). This principle of law has been followed in a number of jurisdictions, *see, e. g. Wagner Electric Corp. v. Local 1104*, 496 F.2d 954, 956 (8th Cir. 1974), and generally holds that as long as a union is functioning as a union, it must be held responsible for the mass action of its members.

In *International Union*, Judge Goldsborough was faced with a situation where 350,-000 to 450,000 union members throughout the country walked off the job in unison. Presented with evidence of prior communications between the international and local unions compelled him to conclude that someone had necessarily directed the strike. To hold otherwise would have provided union leadership with immunity from liability for "unauthorized" strikes which they may have instigated in a covert fashion.

■ Despite this conclusion, Judge Goldsborough recognized that if the union leadership had shown that they had "lost [their] hold on [their] members" then a different conclusion would result. He felt that by a

*W. A.*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979).

legitimate showing of loss of control over members, the union as an entity could be absolved of any attempt at directing a strike by veiled or secretive means and the mass action theory would not apply. As plaintiff acknowledges in its memorandum, this is precisely the situation defendant here was confronted with.

Plaintiff concedes that "the officers, although mindful of their duty to do so, were unable to control the rank and file." This fact is further evidenced by president Miller's inability to get members back to work even after a temporary settlement had been negotiated with plaintiff. Since both plaintiff and defendant agree that the defendant had lost control over its members, the mass action theory cannot be applied. There existed no possibility of union leadership covertly instigating the strike.

■ In summary, it appears to me that where there is a correlation of action between the union as an entity speaking and acting through its officers, and the general membership, the union as an entity may be liable in damages.

■ Further, inappropriate activity by the officers alone when representing the entity may result in liability of the union entity in damages. But where there is a *bona fide* disparity of action by the entity speaking through the officers and action by union members on an adventure of their own, there is no current basis in law for subjecting the union as an entity to damages.

■ In short, to subject the local union to damages, entity activity through officer action or inaction must be present. Mass action by members may be an evidentiary base to find such officer action. This court is aware of the dilemma in which such a state of the law leaves plaintiff and comparable employers. As parties to a no–strike agreement, an employer may be indemnified for violations of the agreement only if the union itself as an entity in some way causes, ratifies or condones a breach of the no–strike provision of the contract.

■ On the other hand, if the union members, on their own, choose to violate the agreement, despite the earnest and *bona fide* supplication of union officials, the employer is left without recourse for the damages incurred as a result of such precipitous employee action. *See Atkinson et al. v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Sinclair Oil Corp. v. Oil, Chemical & Atomic Workers Int. Union*, 452 F.2d 49 (7th Cir. 1971); *Kaiser Steel Corp. v. James Fivecoat*, 484 F.Supp. 824 (D.Utah 1980).

In drafting Section 301 of the National Labor Relations Act, Congress hoped to shield individual union members from liability to avoid the harsh results of decisions like *Loewe v. Lawlor*, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908), and apparently felt that the sanctions of discipline or discharge would be sufficient to insure compliance with no–strike agreements. This policy and its consequences result from deliberate and considered Congressional statutory design and if they are inappropriate, are a matter for legislative and not judicial resolution.

## INJUNCTION

■ Plaintiff further asks that defendant be enjoined from authorizing or participating in illegal work stoppages in violation of the collective bargaining agreement. Since this court has concluded that defendant has not instigated, authorized or condoned the work stoppages engaged in by individual union members there is no union activity subject to injunction. The no–strike agreement currently in force between the parties has been fully complied with by defendant.

## CONCLUSION

In light of the foregoing, it is hereby ORDERED that defendant's Motion for Summary Judgment be GRANTED, and that plaintiff's Motion for Partial Summary Judgment be DENIED. Let Judgment be entered accordingly.