664 F.2d 1184
 109 L.R.R.M. (BNA) 2335, 92 Lab.Cas. P 13,192
 NORTH RIVER ENERGY CORPORATION, a corporation,
Plaintiff-Appellee Cross-Appellant,
v.
UNITED MINE WORKERS OF AMERICA; District 20, et al., Defendants,
Local No. 1926, United Mine Workers of America,
Defendant-Appellant Cross-Appellee.
 No. 80-7933.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 28, 1981.
 
 William E. Mitch, Earl V. Brown, Jr., Birmingham, Ala., for defendant-appellant cross-appellee.
 Thomas Taliaferro, Forman, Burr & Murray, C. V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellee cross-appellant.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before TUTTLE, HENDERSON and HATCHETT, Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 This appeal requires the review of a trial court's application of common law agency principles in finding that a local union authorized and ratified only one of seven wildcat strikes at an Alabama mine in violation of an implied "no-strike" clause. Concluding that the district court's findings are not erroneous, we affirm.
 
 FACTS
 
 2
 North River Energy Corp. (North River) operates an underground coal mine in Fayette County, Alabama. The approximately 450 miners working there are members of Local 1926 (Local), United Mine Workers of America (UMWA). The union and employer were parties to a collective bargaining agreement entitled the "National Bituminous Coal Wage Agreement of 1978,"[1] which contains an implied "no-strike" clause and a mandatory grievance and arbitration procedure.
 
 
 3
 The instant case arises out of an unauthorized or "wildcat" strike that erupted at North River's No. 1 mine in Fayette County on May 29, 1979. The genesis of the work stoppage was a "search notice" posted by the company which indicated that it reserved the right to inspect the miners' persons, lunch boxes, lockers and automobiles in an effort to combat losses of company-owned property. On the first day of the strike, the Local conducted a special meeting at which the members discussed the reason for the strike, that is, the company notice concerning inspection. At this meeting Local president Leon Howell directed the miners to return to work. An eyewitness in attendance testified that no vote was taken concerning the controversy. Further, the striking miners did not picket or engage in other overt signs of strike activity.
 
 
 4
 On May 30, Local president Howell informed mine superintendent Paul Holder that the men would return to work, but only when the company removed the disputed notice. A witness to this discussion testified that Howell neither couched this message as an ultimatum nor indicated that his statements reflected the position of the union membership. Later that day, Howell presented management with a written grievance regarding the search policy.
 
 
 5
 Towards the latter part of this strike, Howell sent a telegram to North River's management in Uniontown, Pennsylvania, objecting to the proposed searches as violative of the miners' statutory and constitutional rights.[2] The message also stated that the search policy was not an arbitrable matter under the collective bargaining agreement. On June 9, 1979, the telegram was approved for payment by and read to the union membership.
 
 
 6
 North River filed a complaint for injunctive relief and damages under section 301 of the Labor-Management Relations (Taft-Hartley) Act of 1947, as amended, 29 U.S.C. § 185 (1970), against the UMWA, UMWA District 20, and Local 1926, UMWA. Although the district court issued a temporary restraining order enjoining the strike on June 5, 1979, none of the Local union officials and committeemen[3] returned to work for forty-eight hours. Work resumed after seven days or twenty-one shifts, and grievance procedures led to the modification and subsequent re-posting of the search notice.[4]
 
 
 7
 Over the next year the company experienced six short wildcat strikes, lasting between three and ten shifts, as a result of which North River filed an amended complaint for damages. All production and maintenance employees and all Local union officers and committeemen, with the exception of mine safety personnel known as fire bosses and pumpers, participated in all seven strikes.
 
 
 8
 After a bench trial, the district court entered into the record orally dictated findings of fact and conclusions of law holding the Local liable for the original strike and assessing damages for company losses at $140,693. In concluding that the union membership actually authorized and ratified the original wildcat strike, the court specifically found that the Local authorized the work stoppage at the "special" meeting conducted on May 29. The court found that "whether formal or informal, some sense of meeting of the membership or of the officers was taken." The court also based its finding on the fact that, later that day, union officials told mine superintendent Holder "that the men would return to work, but only if and when the notices were taken down concerning the inspection." Finally, the court deemed the Howell telegram as tantamount to union approval and ratification of the strike because Howell's message claimed that the strike was outside the purview of the collective bargaining agreement and therefore not an arbitrable matter.
 
 
 9
 The trial court held, however, that there was not sufficient evidence from which to conclude that the Local "similarly authorized or ratified" the six subsequent strikes for which North River sought damages. In finding the Local not liable for these strikes, the court stated that:
 
 
 10
 The mere number of strikes does not constitute a sufficient basis ... for inferring Union approval and authorization, particularly where, as here, the strikes, for the most part, were one and two days in length ... and were resolved, so far as appears, without the necessity of court intervention to direct the membership back to work.
 
 
 11
 The court also found that neither the International nor District 20 authorized, ratified, or instigated any of the seven work stoppages.
 
 
 12
 The Local now appeals the trial court's finding of union responsibility for the original wildcat strike. The employer has cross-appealed, contesting the district court's failure to find the Local liable for the six short work stoppages.
 
 
 13
 The Local raises two points on appeal. First, it contends that the district court erred in premising its liability for expressly "authorizing" the first strike upon Howell's discussion with Holder and upon the telegram sent by Howell to North River. The Local posits that Howell's expressions of disagreement with management's position was merely a personal representation of opposition or, alternatively, an exercise of his functions as collective bargaining representative. To require Howell to refrain from expressly disagreeing with the employer during the pendency of an unauthorized strike, the Local argues, would effectively reduce and eliminate his automony as collective bargaining agent. Second, the Local argues that under the standards recently enunciated in Carbon Fuel Co. v. UMWA, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), the district court erred in imposing liability for the original strike upon the union because the Local did nothing to instigate, encourage, or prolong the unauthorized work stoppage, but rather attempted to suppress it.
 
 
 14
 North River argues that the district court's finding that the Local authorized and ratified the original strike was amply supported by evidence that the membership approved this strike at a union meeting and adopted the mailagram sent by the Local president advocating continuation of the strike. The employer disputes, however, the trial court's holding that there was not sufficient evidence of union responsibility for the six subsequent strikes. First, the company argues that the court erroneously held the employer to a higher standard of proof, contrary to the common law of agency, by requiring proof of actual authorization or ratification. Second, the employer contends that the Local is liable by virtue of the acts of all of its officers in participating in these latter strikes. Third, North River contends that the Local was responsible for the six subsequent strikes under the "mass action" theory. Finally, North River asserts that the court committed error in giving weight to the fact that the last six work stoppages were short-lived and that the employer did not seek an injunction against these strikes.
 
 ISSUES
 
 15
 We must determine whether the district court erred in finding that the Local union authorized and ratified the original wildcat strike and in finding no sufficient evidence to warrant Local union responsibility for the six subsequent strikes.
 
 THE LOCAL'S APPEAL
 
 16
 In assessing whether the district court erred in holding the Local liable for "authorizing" the first work stoppage, we note that findings of fact by a district court shall not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding of fact is "clearly erroneous," although there is evidence to support it, when the reviewing court is left with the definite and firm conviction that a mistake has been committed. Scott v. Moore, 640 F.2d 708, 729 (5th Cir. 1981). Great weight must be given to the findings made and inferences drawn from the evidence by the trial court. Croy v. Campbell, 624 F.2d 709, 710 n. 1 (5th Cir. 1980). The clearly erroneous standard, however, does not apply to "ultimate fact" determinations. Rather, the reviewing court is free to make an independent determination of the ultimate fact, guided by the trial court's determination of subsidiary facts which are not themselves clearly erroneous. United States v. Wiring, Inc., 646 F.2d 1037, 1041 (5th Cir. 1981).
 
 
 17
 An independent review of the evidence before the trial court reveals that its finding of authorization, which is an "ultimate fact," Central Appalachian Coal Co. v. UMWA, 376 F.Supp. 914, 923 (S.D.W.Va.1974), is not improper. The evidence indicates that the Local met on the second day of the first wildcat strike to discuss the work stoppage. Mine superintendent Holder testified that the Local president unequivocally stated to him later that day that the Local's membership "voted" at its meeting to return to work only if the company removed the notice.
 
 
 18
 The union notes that the only witness with firsthand knowledge of the union meetings, a grievance committeeman, testified that the membership did not vote at any union meeting conducted during the strike, but met on the second day of the first strike merely to request the employer to remove the inspection notice. Therefore, the Local argues, the best evidence of record is that no vote occurred at the Local union meeting. Appellate courts, however, are reluctant to set aside determinations of subsidiary fact based upon an assessment of the demeanor and credibility of witnesses, a matter entrusted to the discretion of the trial court. Wiring, 646 F.2d at 1041; Scott, 640 F.2d at 729. In this regard, the appellate court may not consider the evidence anew and therefore may not set aside the district court's findings merely because it might have reached a different result on the same evidence. Scott, 640 F.2d at 729.
 
 
 19
 Thus, we conclude that a legitimate inference could be drawn that the Local "authorized" the strike by making a collective decision not to return to work. See Jim Walter Resources, Inc. v. International Union, UMWA, 609 F.2d 165, 169 (5th Cir. 1980) (strike conducted and authorized by members of union functioning as a union where members unanimously voted to strike); Truck Drivers & Helpers Local Union No. 728 International Brotherhood of Teamsters v. NLRB, 265 F.2d 439, 443 (5th Cir.), cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 186 (1959) (union induced boycott by deliberately attempting to produce collective union action by union acting as a union: union officers called and conducted meeting and members voted as union members).
 
 
 20
 The telegram sent to the company several days after the inception of the strike was signed by the Local union's president and authorized for payment by a vote of the membership. Moreover, the message stated that "(t)he employees of North River No. 1 Mine" were holding the company liable for losses resulting from the work stoppage and that the company's action constituted a violation of "our" civil and constitutional rights. Because this evidence indicates that the mailagram was a product of the union functioning as a union and reflected the sentiments of the Local as a collective body, the district court also correctly concluded that the Local "ratified" the original strike.
 
 
 21
 The union also argues that it should not be responsible for its president's actions because he acted pursuant to his role as collective bargaining representative, and, therefore, as a matter of law his actions cannot represent his adoption of the employees' cause. The Local relies on United Steel Workers of America v. Lorain, 616 F.2d 919 (6th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981), for the proposition that the fact that a union aided its employees in presenting their grievances could not be used as evidence of intent to support the strike because such assistance merely constitutes the performance of the normal union function of representing its members. We find this argument to be without merit. First, the trial court based its findings of union authorization and ratification not merely on the telegram sent by Howell and Howell's message to Holder that the employees voted to return to work if the company would remove the notice. Rather, the court relied on the miners' vote or consensus to return to work if the notice came down, their adoption of the mailagram in the minutes of the June 9, 1979 meeting as an act of the membership, and their approval of payment for the telegram.[5]
 
 
 22
 Second, the union's reliance upon Lorain is misplaced. The Sixth Circuit stated that the union's attempts to discuss the substance of grievances with the employer did not constitute ratification of the strike. The Lorain court, however, distinguished between presenting grievances as a means of asserting the validity of a strike from seeking to resolve barriers standing in the way of persuading employees to return to work. In asserting that the reason for the strike was outside the purview of the collective bargaining agreement and that the employer's actions constituted a violation of the miners' civil and constitutional rights, Howell's telegram constituted an affirmation of the validity of the strike.
 
 
 23
 Third, the fact that the union president was acting within the scope of his authority as collective bargaining representative is a predicate for union liability under common law agency principles. These rules hold a union liable for all acts of its officers and agents within the scope of their general authority, regardless whether these acts were specifically authorized or ratified. United States Steel Corp. v. UMWA, 519 F.2d 1249, 1253 (5th Cir. 1975); Vulcan Materials Co. v. Steelworkers, 430 F.2d 446, 454 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971).
 
 THE COMPANY'S APPEAL
 
 24
 North River asserts that the district court applied the wrong standard of union liability as to the six subsequent strikes. The company urges that union responsibility may be inferred as a matter of law under common law agency principles on the bases that (1) all of the union officers participated in these strikes while acting within the scope of their authority, and (2) participation of virtually the entire work force at North River No. 1 mine rendered the union liable under the "mass action" theory of liability. The employer also objects to the district court's consideration of the short duration of these strikes and the fact that North River obtained no injunction against them.
 
 
 25
 We conclude that the district court applied the proper standard of liability and correctly adjudged the local free of responsibility as to the six subsequent wildcat strikes.
 
 
 26
 In contending that the trial court employed the wrong standard of liability, North River asserts that the court required the employer to show "actual" authorization or ratification. North River points to the following language in the district court's findings of fact, immediately following its finding of "actual authorization and ratification by Union membership" of the original strike:
 
 
 27
 The Court, as indicated, however, finds no sufficient evidence to indicate instigation, authorization, or ratification in any respect by the International or by District 20. Nor can the Court find sufficient evidence from that presented to indicate any similar approval or authorization or ratification by the Union, that is, the Local of the six subsequent strikes.... (Emphasis added.)
 
 
 28
 North River posits that the use of the term "similar" in characterizing the form of approval, authorization or ratification requisite for liability, directly after finding "actual" authorization as to the original strike, was an application of the strict respondeat superior test under the Norris-LaGuardia Act, § 6, 29 U.S.C. § 106 (1973),[6] which requires "clear proof of actual participation in, or actual authorization of such acts or of ratification of such acts after actual knowledge thereof." The company contends that the correct test for union liability for the acts of its agents is based on the Taft-Hartley Act, § 301(b, e), 29 U.S.C. § 185(b, e) (1970),[7] which adopts the common law agency test and the common law doctrine of respondeat superior. In its most recent pronouncement on this subject, the Supreme Court in Carbon Fuel Co. v. UMWA, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), recognized that under section 301 of the Taft Hartley Act "Congress limited the responsibility of unions for strikes and breach of contract to cases where the union may be found responsible according to the common law rules of agency." 444 U.S. at 216, 100 S.Ct. at 413. The Court noted that Congress "stopped short of imposing liability upon a union for strikes not authorized, participated in, or ratified by it." 444 U.S. at 216, 100 S.Ct. at 414.
 
 
 29
 We agree that common-law agency principles govern the Local's liability in the instant case for the unauthorized strikes. Nevertheless, we cannot say that the district court applied the wrong standard of liability. In fact, the district court noted that it failed to find "similar" authorization by the Local of the six subsequent strikes immediately after finding that neither the District nor the International instigated, authorized, or ratified the strikes in any respect. Such broad language indicates that the district court did not confine its assessment of union liability to an examination of actual authorization.
 
 
 30
 North River also argues that the Local is responsible under two separate bases of liability established by case law. First, a union may be found accountable in damages for the actions of its officers and agents according to ordinary agency principles. United States Steel Corp. v. United Mine Workers, 598 F.2d 363 (5th Cir. 1979); Wagner Elec. Corp. v. Local 1104, Int'l Union of Elec., Radio & Mach. Workers, 496 F.2d 954 (8th Cir. 1974). Second, unions have been held liable for the mass action of its members where the union membership conducts the illegal activity while functioning as a union entity. Turnkey Constr., Inc. v. Cement Masons, 580 F.2d 798, 800 (5th Cir. 1978); Vulcan Materials, 430 F.2d at 455.
 
 A. AGENCY THEORY LIABILITY
 
 31
 Generally, a union is not liable for the unsanctioned acts of its members. Thus, under the first theory, liability is dependent upon a showing that the union in some way made itself a party to the illegal strike. United States Steel Corp. v. UMWA, 598 F.2d at 365. In showing union complicity, the company must therefore prove that the agents of the union participated in, ratified, instigated, encouraged, condoned, or in any way directed the unauthorized strike for the union to be liable in damages. United States Steel Corp., 519 F.2d at 1253; United Constr. Workers v. Haislip Baking Co., 223 F.2d 872, 876 (4th Cir.), cert. denied, 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).
 
 
 32
 It is necessary, however, that the acts of a union agent be committed within the scope of his general apparent authority and on behalf of the union. Central Appalachian Coal Co., 376 F.Supp. at 923. Such acts bind the union, regardless of whether they were specifically authorized or ratified. United States Steel, 519 F.2d at 1253; Vulcan Materials, 430 F.2d at 457. The only activity which North River relies upon which is indicative of union authorization, ratification, or approval, is the fact that all of the union officials and committeemen failed to work their shifts in each of the six subsequent strikes. This fact, in itself, cannot be construed as participation and authorization by the union as an entity in the strike. Cf. Consolidation Coal Co. v. International Union, UMWA, 500 F.Supp. 72, 75 (D.Utah 1980) (fact that all union officials failed to work in itself cannot be construed as union ratification of strike where each official was threatened). The employer neglected to adduce any evidence whatsoever that the officers committed the illegal activity pursuant to their union responsibilities or in a representative capacity so as to hold the Local liable. 500 F.Supp. at 77.
 
 
 33
 It is true, however, that a series of strikes which indicate a pattern of union activity "may give rise to, or at least support, an inference of union 'instigation, support, ratification or condonation.' " United Steel Corp., 519 F.2d at 1256, quoting Central Appalachian Coal Co. v. UMWA, 376 F.Supp. 914, 923 (S.D.W.Va.1974). Nevertheless, the fact that the strike occurred is not sufficient in itself to raise the presumption that the union, as an entity separate from its members, is responsible. United States Steel, 519 F.2d at 1253.
 
 
 34
 None of the appellate cases cited by the company support the high standard of vicarious liability it urges. Those cases, unlike the present case, involved actual or apparent involvement, encouragement, or ratification by union agents while exercising their duties as union agents within the general scope of authority. In fact, in most of these cases, the union official called the strike.[8] See, e. g., NLRB v. Armour-Dial, Inc., 638 F.2d 51 (8th Cir. 1981) (presence of union executive committee members at meetings between union and company at which union president made illegal threats, coupled with the acquiescence with the union's position as espoused by the president constituted participation in and inducement of subsequent work stoppage); Wagner Elec. Corp., 496 F.2d at 956 (union responsible for strike, in part, because of circumstances surrounding union meetings and involvement of union officers and stewards in initiating strike); UMWA v. Patton, 211 F.2d 742, 746 (4th Cir.), cert. denied, 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed. 649 (1954) (in finding liability, the court pointed to the fact that a union field representative, engaged in union organization work, called the strike for the purpose of forcing unionization).
 
 
 35
 Similarly, in Vulcan Materials, a leading authority on this subject in the Fifth Circuit upon which North River relies, the unions, through their agents, affirmatively induced and encouraged the employees to strike. For instance, the Vulcan court found that the international representative induced employees to strike by placing union committeemen in charge of the picket line and by encouraging employees at one plant to picket with employees striking at an adjacent plant. Moreover, the union told Vulcan employees that it recognized the picket line as legal. A committeeman in charge of the line also stated that he would not work for Vulcan while the union struck at the adjacent plant. These statements, the court found, constituted inducement or encouragement to refrain from working.
 
 
 36
 Because North River has failed to introduce any evidence that the union agents were acting within the scope of their authority as union agents and on behalf of the union affiliate, aside from the fact that they failed to report to work, we hold that the district court did not err in refusing to hold Local 1926 liable as to the six subsequent strikes. Unlike the evidence regarding the original wildcat, the distinction between individual action and collective action as to the six subsequent strikes was "fuzzy and confused."
 
 B. "MASS ACTION" THEORY LIABILITY
 
 37
 North River next urges that this court hold Local 1926 liable under the "mass action" theory of responsibility which holds that "as long as a union is functioning as a union it must be held responsible for the mass action of its members." Vulcan Materials, 430 F.2d at 455 (emphasis added).
 
 
 38
 The mass action theory was first articulated in United States v. International Union, UMWA, 77 F.Supp. 563 (D.D.C.Cir.1948), aff'd in part, 177 F.2d 29 (D.C.Cir.), cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949), which involved a strike wherein 350,000 to 450,000 union members throughout the country struck in unison. Evidence of prior telegrams between the international and local unions compelled the district court to conclude that the union orchestrated the strike. The Third Circuit in Eazor Express Inc. v. International Bhd. of Teamsters, 520 F.2d 951 (3d Cir. 1975), cert. denied, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), has explained the underlying rationale of the mass action theory as follows:
 
 
 39
 When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members.
 
 
 40
 520 F.2d at 963. Liability under this theory, however, is limited to the entity whose membership acts in concert, usually the local union. United States Steel Corp. v. UMWA, 534 F.2d 1063, 1074 (3d Cir. 1976).
 
 
 41
 In the principal cases holding the union liable under the mass action theory, a correlation existed between the actions of the union as an entity speaking and acting through its officers, and the conduct of its membership. Consolidation Coal Co., 500 F.Supp. at 77. For example, in Turnkey, where virtually the entire membership of the local was engaged in the organized and concerted boycott activity, evidence existed that a union agent arranged and conducted a meeting between the entire membership and a company representative at which the terms for ending the boycott were spelled out. The court concluded that such evidence supported a finding that the strike was conducted by the local as a functioning entity. 580 F.2d at 800. The union in Vulcan was also deemed to be functioning in its union capacity based on evidence that at no time during the pendency of a union strike at one plant did union members at an adjacent plant report for work. The Third Circuit in Eazor Express also found that the union was functioning as a union where striking members of one local appeared at the employer's terminal in another city and established a picket line which members of the local refused to cross.
 
 
 42
 We find little evidence in the instant case that the Local was functioning as a union entity engaged in a concerted unauthorized strike. Rather, the evidence is equally susceptible of an interpretation that the individual union members were engaged in an adventure of their own. We therefore hold that the so-called mass action theory does not provide an additional basis for finding union liability in this case.
 
 C. SUBSIDIARY LIABILITY FACTORS
 
 43
 Finally, North River argues that the district court premised its decision holding the Local not liable for the latter six strikes on the short duration of these strikes and on the employer's failure to seek relief, neither of which is relevant to union liability. We disagree. The court merely considered these points as factors entering into its decision. See Eazor Express, 520 F.2d at 965 (union entitled to reasonable period of time after inception of strike in which to take action before liability attaches for failure to end unauthorized strike under no-strike pledge); United States Steel, 519 F.2d at 1255, citing Eazor Express (liability cannot be imposed upon local union having no foreknowledge of strike until it has a reasonable time after inception of strike to take action). As Judge Maris noted in Eazor Express :
 
 
 44
 courts upholding liability ... upon the mass action theory ... have stressed the failure of the unions involved to take steps, other than written and oral exhortation, speedily to terminate illegal strikes as an indication of passive acquiescence in the strike.
 
 
 45
 520 F.2d at 964.
 
 CONCLUSION
 
 46
 We hold that the district court did not err in finding the Local liable for the original wildcat strike and in refusing to attribute liability to the Local for the six subsequent strikes.
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 The provision for grievance procedures under the National Bituminous Coal Wage Agreement of 1978, at 147-49, was effective at all times material to the instant case and provides in pertinent part:
 Should differences arise between the Mine Workers and an Employer as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time.
 Disputes arising under this Agreement shall be resolved as follows:
 ....
 (4) In cases where the district representative and the representative of the Employer fail to reach agreement, the matter shall, within ten calendar days after referral to them, be referred to the appropriate district arbitrator who shall decide the case without delay.
 
 
 [2]
 The telegram, which was addressed to R. H. Foley, Director of the Coal Mining Division, was dated June 5, 1979, and read as follows:
 Local Union 1926 UMWA representing employees of North River No 1 Mine contends the issue we are involved in is not arbitrable. It is not part of the National Bituminous Coal Wage Agreement. The employees of North River No 1 Mine holds R H Foley Paul Holder and the North River Energy Corp liable for all time lost by members of Local Union 1926 because of this issue. The problem is a violation of our civil rights the statute of the State of Alabama and the Constitution of the United States of America. We contend that North River Energy Corp aggravated instigated and is totally responsible for the disruption of operation at the North River No 1 Mine.
 R H Foley nor Paul Holder has made any reasonable accomodation to settle this issue between May 22 1979 and now. Therefore we the employees of North River No 1 Mine holds North River Corp liable and accountable for all time lost and expenses accrued by the employees and by union representatives since May 22 1979.
 Leon Howell President Local Union 1926
 United Mine Workers of America
 Rt 1 Box 238A North Port Al 35476
 
 
 [3]
 The union committeemen handle grievances and negotiations over working conditions for the union when management and employees fail to do so
 
 
 [4]
 The district court entered a preliminary injunction on June 15, 1979, extending the terms of the temporary restraining order conditioned upon the employer's submission to arbitration over the search notice
 
 
 [5]
 The minutes of the union meeting of June 9, 1979, state that the "mail-a-gram ... was mailed by membership of Local 1926," and it is undisputed that the union paid the transmittal costs
 
 
 [6]
 Norris-LaGuardia Act, § 6, 29 U.S.C. § 106 (1973):
 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 
 
 [7]
 Section 301(b) of the Taft-Hartley Act, 29 U.S.C. § 185(b) (1978), reads in pertinent part:
 Any labor organization which represents employees in an industry affecting commerce ... shall be bound by the acts of its agents.
 Section 301(e) reads:
 For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.
 
 
 [8]
 In analyzing the definition of the term "agent" in section 301(e), Senator Taft stated:
 In defining the term the conference amendment reads 'the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.' This restores the common law of agency as it has been developed a common law.
 ....
 ... (T)he definition applies equally in the responsibility imputed to both employers and labor organizations for the acts of their officers or representatives in the scope of their employment.
 ... (U)nion business agents or stewards, acting in their capacity of union officers, may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair-labor practice in the bill, even though no formal authorization has been taken by the union to authorize or approve such conduct.
 
 
 [93]
 Cong.Rec. 6859 (1947) (remarks of Sen. Taft) (emphasis added)