**ALABAMA POWER COMPANY,**
**Plaintiff-Appellant,**

v.

**LOCAL UNION NO. 1333, LABORERS'**
**INTERNATIONAL UNION OF NORTH**
**AMERICA, Defendant-Appellee.**

**No. 83–7157.**

United States Court of Appeals,
Eleventh Circuit.

June 25, 1984.

---

John Richard Carrigan, Birmingham, Ala., for plaintiff-appellant.

Clarence F. Rhea and Donald R. Rhea, Gadsden, Ala., for defendant-appellee.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA *, Senior Circuit Judge.

---

\* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The Project Labor Agreement contained the following clause:

AFFIRMATION OF OBJECTIVE—Both the contractor and the Union recognize and acknowledge that heavy financial damage could be incurred by Alabama Power Company, and similarly by the contractor and its employees represented by the Union in the event of the

**GARZA, Senior Circuit Judge:**

This is an appeal from an action for the alleged breach of a labor contract. The district court, following a bench trial, found for the defendant Union. Plaintiff Alabama Power Company ("APCO") appeals.

## FACTS and PROCEDURAL HISTORY

APCO is a public utility producing and selling electric power in Alabama. APCO entered into a construction contract with Manhattan-Walton, a contractor, for construction of the R.L. Harris Hydro Plant at Lineville, Alabama. Manhattan-Walton was party to a labor contract with several unions, including the defendant. The labor contract prohibited the Union from striking, and obligated the Union to "take meaningful action" to promptly end any unauthorized strike. Although APCO was not a party to the labor contract, it was a third party beneficiary thereunder.[1]

The Union's business manager and recognized representative, James Vickery, resides in Gadsden, Alabama, where the Union's office is located. Vickery had appointed three stewards at the Harris Plant site, which is some 80 miles from Gadsden. The chief steward, Jimmy Suggs, was authorized by Vickery to file grievances on behalf of the Union.

On Thursday, September 17, 1981, Manhattan-Walton Superintendent Joe Cannon discharged several workers. Many of the laborers became upset over the firings and began talking about striking. By Friday, September 18, Suggs had learned that there might be a walkout on Monday the 21st. Suggs called Vickery and informed him of this possibility on Sunday, September 20. Vickery instructed Suggs to do

interruption of scheduled construction of West Jefferson Steam Plant, Mitchell Dam Redevelopment and R.L. Harris Hydro Plant and the likelihood of resulting legal actions which would be a burden to all involved. Accordingly the parties hereto specifically affirm it is their objective to end promptly any illegal or unauthorized work stoppage arising from a labor dispute or disagreement and pledge to take meaningful action to accomplish same.

everything he could to keep the Union members working and directed him to meet with the members for that purpose.

On Monday the 21st, Suggs met with the first shift Union members after a routine safety meeting. Suggs informed the workers that he had talked with Vickery and that a work stoppage was illegal and would not be authorized by the Union. He further explained that if the workers walked off the job they could be fired and the Union could be sued. Nevertheless, someone in the crowd called for a show of hands and a majority of those present voted to strike. At the conclusion of the meeting, Suggs picked up his lunch box and walked out to the parking lot. The Union members walked off the job and congregated outside the main entrance to the construction site. Union members not at the meeting learned of the walkout and also left their jobs, as did employees represented by other unions. At least one sign was placed in the road, proclaiming "Manhattan-Walton unfair".

Suggs testified that he drove his car from the parking lot to the Manhattan-Walton trailer and telephoned Vickery, informing him of the walkout. Vickery again told Suggs to talk to the striking members and try to persuade them to return to work. Suggs went out to where the strikers were congregating, where he remained until Vickery and Bruce Carr, a representative of the Laborer's International Union of North America, arrived late that afternoon.

Less than an hour after the strike began, and at the Union's request and expense, the local radio station began periodic broadcasts telling strikers that the walkout was unauthorized and to return to work. When Vickery and Carr arrived at the site they further attempted to persuade the strikers to go back to work. They did not attempt to remove the sign placed in the road by the strikers, however. Their efforts to talk the strikers into ending the strike proved unsuccessful. Vickery, Suggs, and Carr

met with Manhattan-Walton's Superintendent Cannon twice that evening and once the next morning in an effort to resolve the strike. They discussed some fourteen complaints the strikers had presented to Suggs and resolved all except the firing of worker Susan Butler. During these discussions, Vickery offered to replace all of the striking workers.[2] Cannon testified that he clearly understood that Vickery and Carr did not condone the strike and wanted to get the workers back on the job.

Following their meeting with Cannon on Tuesday morning, Vickery, Carr, and Suggs returned to the strike site and told the strikers that Susan Butler's case would be expedited through the normal grievance procedure. Ms. Butler then told the strikers that she did not want them to lose their jobs and that she felt the matter of her discharge could be sufficiently handled through the grievance system. At that point, Suggs told the strikers he was going in to work; the majority of the strikers followed him in and the strike ended, some twenty-six hours after it had begun.

None of the strikers were disciplined for taking part in the strike. Suggs later testified that he had done nothing to get the second and third shift Union members back to work.

APCO filed this action against the Union as a third-party beneficiary of the labor contract between the Union and Manhattan-Walton. The Union filed a third party complaint against Manhattan-Walton alleging that Manhattan-Walton was responsible for the breach. The district court dismissed the third party complaint. As stated, a bench trial of APCO's complaint resulted in a judgment in favor of the Union. On appeal, APCO claims that the district court erred in not holding the Union liable for the strike under the "mass action" theory, and further erred in finding that the Union fulfilled its contractual obligation to take meaningful action to end the strike. APCO also claims that the trial court's

---

**2.** While Vickery offered to replace the striking Union members with workers from other locals throughout the state of Alabama, he acknowledged that doing so would have disrupted work at the site. Presumably, his offer was rejected for this reason.

findings of fact concerning the agency of steward Suggs are clearly erroneous.

## "MASS ACTION" THEORY

■ APCO first urges the court to find the Union liable under the "mass action" theory. That theory of liability provides that "as long as a union is functioning as a union it must be held responsible for the mass action of its members." *Vulcan Materials Company v. United Steelworkers,* 430 F.2d 446, 455 (5th Cir.1970), *cert. denied,* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); *North River Energy Corp. v. United Mine Workers,* 664 F.2d 1184, 1193 (11th Cir.1981). As explained by the Third Circuit in *Eazor Express, Inc. v. International Bhd. of Teamsters,* 520 F.2d 951 (3rd Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976):

> When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members.

520 F.2d at 963. APCO argues that the Union members were "functioning as a union" when they voted to strike and walked off the job, and contends that these actions, without more, are sufficient to hold the Union liable.

■ We first note that our determination of each of these points of error necessitates a review of the district court's findings of fact, which may not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Wiring, Inc.,* 646 F.2d 1037, 1041 (5th Cir.1981), *quoting United States v. United States*

*Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). Furthermore, the findings made and inferences drawn by the trial court are to be given great weight. *Croy v. Campbell,* 624 F.2d 709, 710 n. 1 (5th Cir.1980). The clearly erroneous standard does not apply to the determination of ultimate facts, however, which we may independently determine. *United States v. Wiring, Inc.,* 646 F.2d at 1041.

In declining to hold the Union responsible under the mass action theory, the trial court quoted extensively from *United States Steel Corp. v. UMWA,* 519 F.2d 1249 (5th Cir.1975), to the effect that concerted action by union members alone does not provide liability:

> The fact that the strike took place is not sufficient in itself to raise the presumption that the Union, as an entity separate from its members, is responsible. No federal appellate court case has held unions to the high standard of vicarious liability here urged by United States Steel. Clearly, a union is not responsible for an unauthorized strike.... The Court of Appeals for the Third Circuit has held that even when the union, in its contract, "guarantees that there shall be no strike, stoppage of work, slowdown, or other interference with production," the company must show that the Union did "sanction, approve, or incite the strike." [*Penn Packing Company, Inc. v. Meatcutters Local 195,* 497 F.2d 888, 891 (3rd Cir.1974)].

519 F.2d at 1253. APCO, however, argues that this position has been substantially undermined by two subsequent cases, *Jim Walter Resources, Inc. v. International Union, UMWA,* 609 F.2d 165 (5th Cir.1980) and *Alabama By-Products v. Local No. 1881,* 690 F.2d 831 (11th Cir.1982). Both cases are readily distinguishable. We first note that both cases involved work stoppages in direct contravention of temporary restraining orders and subject to the close scrutiny given actions taken in derogation of a court's order. In *Jim Walter Resources,* a union local was held liable for

violating a temporary restraining order when its members and all of its officers remained on strike after the order prohibiting further striking was entered. The court held the Union accountable for the contempt without reaching the mass action issue since it found that the Union originally had formally authorized the strike. *Jim Walter Resources*, 609 F.2d at 169. In *Alabama By-Products*, a temporary restraining order was entered prohibiting the union local from striking over the implementation of a new attendance policy, an issue subject to arbitration. Nevertheless, the union membership walked off the job because of an incident involving the new policy. The morning after the illegal work stoppage had begun, the local held a meeting at which the decision was made not to return to work. The court found that all five of the union officials involved failed to go to work before the meeting, presided over the meeting, and failed to return to work after the meeting. At the conclusion of the meeting a union representative telephoned the employer and informed him that the members would not be returning to work. Furthermore, the union leadership made no attempt to ascertain the reason for the strike. Under these facts, we affirmed the finding of contempt against the union and the five union officials individually. In neither case did we indicate that the mass action of the union membership alone established union liability.

More instructive on this issue, we feel, is *North River Energy Corp. v. United Mine Workers*, 664 F.2d 1184 (11th Cir.1981). In *North River*, an employer filed an action against a union local for damages resulting from seven wildcat strikes. The district court held the local liable for the first strike but not for the six subsequent strikes. We affirmed in both respects. The facts surrounding the first strike show that at a meeting on the second day of the strike, the union's membership voted to return to work only if the employer took down the controversial "search notice" it had posted the day before. The local's president later sent a telegram to the employer stating that the proposed searches were unconstitutional and that the matter was not subject to arbitration. The telegram purported to speak for the union and was read to the membership and approved for payment by the membership. We thus held that the union had authorized and ratified the strike. Regarding the six subsequent strikes in *North River*, we refused to find "mass action" liability even though all of the union production and maintenance employees and all local union officers and committeemen participated in each of the strikes. "We find little evidence in the instant case that the Local was functioning as a union entity engaged in a concerted unauthorized strike. Rather, the evidence is equally susceptible of an interpretation that the individual union members were engaged in an adventure of their own." 664 F.2d at 1194.

■ We find no support for APCO's argument that the Union membership's action en masse, without more, is sufficient to impose liability on the Union. Liability arises only when a union is acting as a union. As in *North River*, the facts in this case "are equally susceptible of an interpretation that the individual union members were engaged in an adventure of their own." The evidence reflects that the meeting called by Suggs at Vickery's direction was for the sole purpose of advising the workers not to strike. While APCO places much significance on Suggs picking up his lunch box and walking to the parking lot after the meeting, his actions are consistent with his testimony that he did so to drive his car to the Manhattan-Walton trailer to call Vickery. Record, vol. 3, at 454. His remaining at the strike site and writing down the strikers' demands is consistent with Vickery's instructions to try to get the strikers back on the job. We cannot say that the trial court erred in finding that the Union did not endorse or encourage the strike and was therefore not liable under the "mass action" theory.

■ APCO also claims the district court erroneously limited any finding of mass action liability to cases involving a series of

wildcat strikes. We disagree. The record reflects that the court considered the fact that this was the first wildcat strike involving Local 1333, but did not base his decision on this fact.[3] A union's prior strike history is a proper factor to be considered in evaluating the union's responsibility for an unauthorized work stoppage. "[W]hen a pattern of unauthorized strikes has been shown, we think that the union should take strong and effective action with respect to the errant agents to purge itself of an inference that might be drawn that the union had in fact condoned the unauthorized strikes" *United States Steel Corp. v. UMWA*, 519 F.2d 1249, 1256 (5th Cir.1975); *United States Steel Corp. v. UMWA*, 598 F.2d 363, 365–66 (5th Cir. 1979).

## AGENCY OF SUGGS

■ Since a union is generally not liable for the unauthorized acts of its members, liability must be established by proving that the union in some way made itself a party to the illegal strike. *United States Steel Corp. v. UMWA*, 598 F.2d at 365; *North River Energy Corp. v. United Mine Workers*, 664 F.2d at 1192. "In showing union complicity, the company must therefore prove that the agents of the union participated in, ratified, instigated, encouraged, condoned, or in any way directed the unauthorized strike..." *Id.* APCO claims the district court erred in holding that steward Suggs was not an agent of the Union such that his participation in the strike provided Union liability.

■ This determination requires a two-step analysis: first, whether Suggs was an agent of the Union such that his actions were binding on the Union; and second, if Suggs was such an agent, whether his actions provided the necessary participation,

ratification, or authorization required to hold the Union liable. Since we are of the opinion, however, that even if Suggs acted as the Union's agent, his actions did not amount to participation in, ratification, or authorization of the illegal strike, a review of Suggs' agency is not necessary. As we stated in our discussion of APCO's "mass action" claim, Suggs' actions in calling the meeting the morning of the strike, walking to his car with his lunch box, and remaining at the strike site the rest of the afternoon are fully consistent with the testimony that he urged the laborers not to strike and attempted to get them back to work after they walked off the job. APCO points out that Suggs did not attempt to remove the picket sign placed in the road by the strikers. Suggs, however, testified that he did not do so out of fear for his own safety. Record, vol. 3, at 474. Nor do we find clearly erroneous the district court's finding that the strikers' complaints were discussed solely in an effort to end the strike. Finally, although the trial court found that Suggs made no effort to get the second and third shifts back to work, considering that fact together with the rest of his actions, we do not believe that this lack of action amounted to participation in or ratification of the strike. This ground of error is overruled.

## "MEANINGFUL ACTION" REQUIREMENT

The Project Labor Agreement required the parties "to end promptly any unauthorized work stoppage" and "to take meaningful action to accomplish same."[4] APCO claims that the Union failed to take meaningful action to end the strike and is therefore liable for breaching the agreement.

---

**3.** The trial court's Findings of Fact and Conclusions of Law, at page 7, states: "In *United States Steel*, [519 F.2d 1249 (5th Cir.1975),] Judge Pointer of this court granted an involuntary dismissal of a company claim against the union based on an implied no strike clause. The evidence against the union in that case was certainly as significant as that in this case. The appel-

late court remanded because the trial court had excluded evidence of past strikes. There is no such evidence in this case. The fact that there have been no such strikes is entitled to some weight."

**4.** See *supra* note 1.

In support of its argument, APCO contends that the measures taken by the Union to end the strike fell below the measures found by the court to be "foreseeably ineffective" in *United States Steel Corp. v. UMWA*, 598 F.2d 363 (5th Cir.1979). A union may be held to have ratified a strike of its members "where the Union's efforts to return strikers are so minimal that the Union's approval or encouragement may be inferred." *Id.* at 365. Union efforts support this inference when they are "foreseeably ineffective." *Id.* at 366. In *United States Steel Corp.*, the union was held liable for an unauthorized strike of its members even though union officers called several meetings to urge the members to return to work, publicized the meetings by radio, and read the provisions of a temporary restraining order to the members and advised them of the possible sanctions for its violation. APCO argues that the Union in the case at bar failed to take prompt action to prevent the strike even though it had foreknowledge of the strike, and then took only foreseeably ineffective action to end the strike once it had begun. We do not agree.

 Although the Union might have acted quicker and could have done more in its efforts to end the strike, we cannot say that the actions taken were not meaningful. Besides the previously discussed actions of Suggs, Vickery, and Carr in continually admonishing the strikers to return to work and in attempting to resolve the strike by discussing the worker's complaints with Manhattan-Walton, the Union immediately began the radio broadcasts informing strikers that the strike was unauthorized, and later offered to replace each of the striking Union members. In determining that these actions were "meaningful," we take into consideration the fact that this was the first strike the Union had ever experienced at either the Lineville dam site or at any other project involving

Local 1333. In contrast, the mine in *United States Steel Corp.* had experienced an average of one wildcat strike per month during 1977 and nearly one every other month for the preceding five years. As the court stressed in *United States Steel Corp.*, "[t]he conduct of the Local following initiation of the strike must be assessed in light of the mine's strike history." 598 F.2d at 365. We emphasize that there is no "first bite" rule with respect to wildcat strikes, nor do we approve the application of a bright-line grace period within which unions can halt wildcat strikes without being held responsible.[5]

Our opinion being that the district court's judgment was in accordance with the law and the evidence presented at trial, we accordingly affirm.

AFFIRMED.

---

5. The district court noted that the Third Circuit approved a 48 hour grace period for ending an authorized strike in *Eazor Express, Inc. v. International Bhd. of Teamsters*, 520 F.2d 951, 965 (3d. Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). While we do not approve any particular grace period in these types of cases, the short duration of the strike is a factor to consider in evaluating the effectiveness of the Union's efforts to end the strike.